Note—See Animals, 8 A. L. R. 70.

---

CENTRAL NATIONAL BANK OF LINCOLN, APPELLEE, v. FIRST NATIONAL BANK OF GERING ET AL., APPELLANTS.

FILED APRIL 12, 1927. No. 25214.

1. Trusts: TRACING TRUST FUNDS. A trust fund may be followed and recovered in equity by the beneficiary, as against the trustee or his general creditors, either in its original or substituted form, when, and only when, it can be traced to and identified in some specific fund or property.

2. Banks and Banking: INSOLVENCY: TRACING TRUST FUNDS. One seeking, in equity, the allowance of a claim for preference

against an insolvent bank in the hands of a receiver has the burden of proving that his trust fund either came into the possession of the receiver, or was invested in some specific fund or property that came into the hands of the receiver.

APPEAL from the district court for Scotts Bluff county: P. J. BARRON, JUDGE. *Reversed.*

*Morrow & Morrow*, for appellants.

*Field, Ricketts & Ricketts, Honnold & Clarke* and *Mothersead & York, contra.*

Heard before GOSS, C. J., ROSE, DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ.

GOOD, J:

The Central National Bank of Lincoln brought suit in equity against the First National Bank of Gering and its receiver and another to establish a preferred claim, payable in full from the general assets of said bank in the hands of its receiver. The defendant bank will hereinafter be called the bank.

While the bank was open and transacting, under the laws of the United States, a general banking business, it received from plaintiff for collection and return four promissory notes, aggregating in face value about $4,800. Plaintiff transmitted these four notes to the bank in November, 1923. They were received by the bank in a fiduciary capacity and on specific instructions to collect and make return. Two of the notes were by the bank collected from the makers by the latter drawing checks upon their accounts in the bank. Another of the notes was renewed, and the bank sold the renewal note and converted or used the proceeds. The bank was closed December 31, 1923. The fourth of the notes was found in the bank after it went into the possession of the receiver. This latter note was ordered returned to the plaintiff and will not be further considered in this case.

Plaintiff's action is based on the assumption that the proceeds of the three notes in controversy were mingled with

the general assets of the bank, and that they augmented the assets which came into the possession of the receiver, to the extent of the amount of the proceeds of such notes, and that, therefore, plaintiff is entitled to have its claim allowed as preferred and payable from the general assets of the bank in the hands of its receiver. The defense of the receiver proceeds on the theory that the proceeds of the three notes have not been traced by the plaintiff into any specific property that came into the receiver's possession.

The foregoing facts are presented by proper pleadings, carefully drawn. The trial court found for plaintiff, preferred its claim to the full amount of $4,467.23, and directed payment from any funds in the hands of the receiver. Defendant bank and its receiver appeal.

Is plaintiff, under the pleadings and facts, entitled to have its claim preferred and paid out of the general assets of the bank in the hands of its receiver? This is the only question for determination.

It appears that plaintiff was not informed of the collection of the notes and did not know that any of them had been collected or renewed until after the failure of the bank. At the time the two notes were collected and at the time the third note was renewed, the bank gave plaintiff credit upon its books for the amount of the proceeds of each of the three notes. This was done without the knowledge or consent of the plaintiff, and plaintiff never received the proceeds of any one of the three notes. It further appears that assets of the bank, consisting of real estate, furniture, fixtures, bills receivable, altogether having a face value in excess of $400,000, came into the possession of the receiver, but that such assets were probably worth not to exceed 40 per cent. of their face value. There was also an item of about $1,300 in cash. It appears that this cash item was practically extinguished or used in the payment of other preferred claims, pursuant to the order of the comptroller of the currency. It appears also that subsequent to the collection of the two notes and the renewal of the third the bank acquired some new bills receivable; but whether they

represented new loans made from cash funds in the bank, or were renewals of preexisting bills receivable owned by the bank, is not disclosed.

For the sake of argument, it may be assumed that the bank received cash for the three notes in question and that plaintiff has traced the proceeds of its notes into the cash fund of the bank. If there had been a cash fund on hand sufficient to pay the plaintiff's claim, there is no doubt but that it should have been allowed and ordered paid as a preferred claim from such fund, because plaintiff had traced its trust fund into the cash fund. However, since the cash fund has been dissipated and plaintiff has not traced its trust fund into any other specific property, the question arises whether or not it may impress a lien or trust upon all the assets of the bank and have its claim paid therefrom, to the exclusion of general creditors of the bank.

It is manifest that, so far as the bank building, furniture and fixtures are concerned, plaintiff's trust fund did not enter into their purchase and is not invested in those items. It is also apparent that plaintiff's trust fund did not enter into the purchase of any of the bills receivable owned by the bank at and prior to the time it collected or converted the proceeds of plaintiff's notes.

The law relating to the right of a *cestui que trust* to follow trust funds that have been misapplied by the trustee has been one on which the authorities have, from the earliest time, differed. The ancient rule was that money had no ear-marks, and when a trust fund was mingled with other funds it could no longer be identified and could not be reached by the beneficiary. The first departure from this rule was made in the English case of *In re Hallett's Estate,* 13 Ch. Div. (Eng.) 696, in which it was held: "If money held by a person in a fiduciary capacity, though not as trustee, has been paid by him to his account at his bankers, the person for whom he held the money can follow it, and has a charge on the balance in the bankers' hands."

In attempting to follow the rule thus announced, some of the courts went to the extreme of holding that where

trust funds are commingled with the general assets of the trustee the beneficiary has a lien upon all of the assets of the trustee and has a preference over general creditors of the trustee. This rule was announced in *McLeod v. Evans,* 66 Wis. 401, and was followed, to some extent, by the courts of Kansas, Missouri, and Iowa, and, apparently, by this court in the cases of *Anheuser-Busch Brewing Ass'n v. Morris,* 36 Neb. 31, and *State v. State Bank of Wahoo,* 42 Neb. 896. In the last-mentioned cases this court, in effect, held that, where a bank collects money for another, it holds the same as trustee of the owner, and, on the making of an assignment by the bank for the benefit of its creditors, the trust character still adheres to the funds in the hands of the assignee, and the owner is entitled to have his claim allowed and preferred over the claims of general creditors.

Later, the case of *McLeod v. Evans, supra,* and other early decisions by the Wisconsin court were overruled in *Nonotuck Silk Co. v. Flanders,* 87 Wis. 237. In the latter case it was held that one for whom a bank had collected a draft before it failed was not entitled to preference over other creditors if the bank had disposed of the proceeds before the assignee came into possession. The authorities up to that time were quite extensively reviewed in this case. It was there pointed out: "The guiding principle is that a trustee cannot assert a title of his own to trust property. If he destroys a trust fund by dissipating it altogether, there remains nothing to be the subject of the trust. But so long as the trust property can be traced and followed into other property into which it has been converted, that remains subject to the trust." The opinion further quoted from *Little v. Chadwick,* 151 Mass. 110, wherein it was said: "When trust money becomes so mixed up with the trustee's individual funds that it is impossible to trace and identify it as entering into some specific property, the trust ceases. The court will go as far as it can in thus tracing and following trust money; but when, as a matter of fact, it cannot be traced, the equitable right of the *cestui que trust* to follow it fails."

Central Nat. Bank v. First Nat. Bank.

This court also has departed from the rule announced in Anheuser-Busch Brewing Ass'n v. Morris, and State v. State Bank of Wahoo, supra, and has allied itself with the general rule now prevailing in the courts of this country. In the case of State v. Bank of Commerce, 54 Neb. 725, it was held:

"When trust funds are wrongfully converted, and not only do not remain in the hands of, and are not found among the assets of, the wrong-doer but are actually traced out of his hands and shown to have been dissipated, then the beneficiary of the trust fund is not entitled to have his claim allowed as a preferred one against the estate of the insolvent wrong-doer.

"If the trust property consisted of money, the claim of the beneficiary of the trust fund may be preferred to the extent of the cash found among the assets of the insolvent trustee at the time of his failure, unless it affirmatively appears that such cash assets are not part of the trust fund."

In that case it was recognized that the beneficiary of a trust fund could follow it so long as he could trace it into any specific fund or property. In that case a county treasurer deposited trust funds in a bank which afterwards failed. The court held that the county was entitled to have its claim decreed a first lien upon any asset of the insolvent bank which it showed was the product of the beneficiary's moneys. More than $15,000 had been so deposited, and the bank was aware of the fact that it was a trust fund. When the bank failed, it had left in its vaults only $140 in cash. It had used the treasurer's deposit in paying off other depositors of the bank. It was not shown that any part of the public money was represented or embraced in any particular assets of the bank which came into the possession of its receiver. The county was held entitled to reclaim the $140, as being part of the trust fund, but was not entitled to have its claim against the insolvent bank decreed a first lien upon the other assets thereof.

Again, in Morrison v. Lincoln Savings Bank & Safe Deposit Co., 57 Neb. 225, this court held: "The owner of trust

property is not, merely by reason of the character of his claim, entitled to a preference over the general creditors of an insolvent trustee." And further held: "A person asserting a claim for preference against an insolvent estate has the burden of showing that such estate has been increased, to some extent, by the misappropriation of trust funds or property belonging to the claimant." In that case a bank, while a going institution, had received trust funds and, prior to insolvency, had misappropriated them. It was sought to have the claim allowed as preferred against the general assets of the bank. It was announced in the body of the opinion that "the doctrine held in some jurisdictions, that the beneficiary of a trust fund is entitled in a case of this kind to a preference over the general creditors of an insolvent without showing that such fund, or part of it, was included in the assets which came into the hands of the receiver," was expressly repudiated in the case of *State v. Bank of Commerce, supra*. It was further stated therein that the right rests "upon the equitable title of the beneficiary, who, seeking to recover specific property or to fix a charge upon a mass, must trace his estate, and show that the specific thing claimed is in equity his property, or that his estate has gone into and remains in the mass he seeks to charge." Later in the case of *City of Lincoln v. Morrison*, 64 Neb. 822, in an able opinion written by that eminent jurist, Judge Pound, the authorities were again reviewed, and it was therein held that, where a trustee has used the trust fund in paying his debts, the *cestui que trust* is not entitled to a preference over general creditors for the amount of his trust fund so misappropriated.

The principles announced in the last three mentioned Nebraska cases are now firmly established in this jurisdiction. They are supported by the great weight of authority, both English and American, and seem to be based upon sound reason. The rule is that a trust fund may be followed and recovered in equity, as against the trustee or his general creditors, either in its original or substituted form, when, and only when, it can be traced to and identified in

Central Nat. Bank v. First Nat. Bank.

some specific fund or property.  39 Cyc. 350, and cases therein cited; 26 R. C. L. 1348, 1354, 1355, secs. 213, 214, 218, 219, and cases therein cited.  The reason for the rule is not that the beneficiary is entitled to a preference because of the misapplication by the trustee of trust funds, but upon the theory that the trust fund has been traced into, and is a part of or invested in, some specific fund or property of the trustee.

In the instant case, the plaintiff has done no more than to show, at most, that its trust fund was paid into the bank and became commingled with the bank's cash fund.  If there was anything in that fund which came into the hands of the receiver, then plaintiff would be entitled to resort to such fund, because it had traced its property into it.  If plaintiff had shown that the cash fund of the bank, which included plaintiff's funds, was invested in some specific property, he could still follow it to that particular property. It is quite apparent that plaintiff's trust funds were not invested in the bank building, furniture and fixtures; nor were they invested in any of the bills receivable which belonged to the bank at the time the trust funds were paid to it; nor is it disclosed that the trust funds of plaintiff were invested in any of the assets of the bank which came into the possession of the receiver.  The proof, therefore, fails to establish plaintiff's right to a preference out of the general assets of the bank.

It follows that the judgment of the district court is erroneous.  It may be that upon a subsequent trial plaintiff may be able to trace its trust funds into some specific property that came into the possession of the receiver, in which event, of course, plaintiff should be given a preference as to such specific property. The judgment is, therefore, reversed and the cause remanded for further proceedings.

REVERSED.

ROSE, J., dissenting.

I take radical exception to the decision of the majority and to the propositions on which the allowance of plaintiff's preferred claim is set aside.

The First National Bank of Gering, defendant, received from the Central National Bank of Lincoln, plaintiff, and accepted three promissory notes, aggregating with interest $4,467.23, for the sole purpose of collecting and returning the amounts due plaintiff, the owner. To that purpose alone defendant was specifically limited in writing and became a trustee to perform the duty of a fiduciary while openly transacting a banking business. Defendant collected the notes, betrayed its trust, clandestinely credited to plaintiff on its books the proceeds of the notes, hid the trust funds in a wilderness of banking assets exceeding on paper $440,-000, where the converted trust property could not be identified, misappropriated the credits, wrecked the bank, went into the hands of a receiver and challenged plaintiff to trace its trust funds into a specific asset of the insolvent bank on penalty of having them taken by the general creditors of defendant.

The proceeds of plaintiff's notes augmented the deposits in the insolvent bank, increased the general assets, replenished the depleted bank reserve and paid banking obligations to general creditors. The mere change in the form of the trust property from notes to proceeds, from proceeds to credits, and from credits to assets, did not change the ownership. Plaintiff, the beneficiary, remained the owner. Defendant never acquired title to the notes nor to the proceeds nor to the credits, but, violating its duties as a fiduciary, converted the trust property to its own use by means of fictitious credits and misappropriations. Between plaintiff and defendant the contractual relation of banker and depositor was never created. The use of the trust funds for banking purposes was never authorized. Plaintiff had no knowledge of the collections or the credits or the misappropriations until after defendant had unlawfully spent the trust money and until after the comptroller had closed the insolvent bank when it had on hands in cash $1,370.42 only—a fund practically exhausted.

Recognized principles of equity adapted to ethical banking under existing conditions and customs require payment

of plaintiff's claim out of the augmented assets to which the proceeds of the notes were illegally and fraudulently diverted.  Departing from these principles, the majority have rendered a decision which permits general creditors of defendant to collect their debts in part from plaintiff, an innocent suitor that did not participate in any wrongful, fraudulent or illegal act, or transfer its property to defendant or to the receiver or to the general creditors by any instrument known to the law.  Plaintiff did not owe any debt or make any agreement authorizing defendant to use the trust property in the banking business.  The proceeds of plaintiff's notes were not seized on execution or attachment.  The decree appointing the receiver did not authorize him to apply the trust funds of plaintiff to the payment of defendant's debts.  The general creditors have no greater right to plaintiff's converted trust property than defendant.  The effect of the decision is to allow the general creditors the benefits of defendant's conversion and to apply the converted trust property to the payment of their contractual claims against the trustee.  After reading what courts and text-writers have said on this subject, I am of the opinion there is no reason in morals, law or logic for the failure of a court of equity to restore to plaintiff from the mass of defendant's assets the equivalent of the converted proceeds of the notes.  The majority rule, defeating plaintiff's claim for payment out of the mass of assets in the hands of the receiver, as stated in the syllabus, is:

"A trust fund may be followed and recovered in equity by the beneficiary, as against the trustee or his general creditors, either in its original or substituted form, when, and only when, it can be traced to and identified in some specific fund or property."

I solemnly protest against this rule that sets bounds to equity power and thus prevents the court from restoring trust money indistinguishably mingled with assets in the hands of a dishonest trustee, unless "when, and only when," the beneficiary can trace it to, and identify it in, some specific fund or property.  Under that rule equity does not af-

ford a remedy, if the lawless trustee converts the trust property and hides it in assets where the beneficiary cannot identify it. Banking, finance and commerce have outgrown the rule stated, if it ever had any foundation in righteousness. Limitation of equitable power to a hidebound rule often defeats justice.

The mission of equity will fail if it is not permitted to develop with honest business and existing conditions. Knavery is progressive and more vigilant than equity at a standstill. Rascaldom invents at night devices to evade and cheat fixed rules of equity announced by courts in the light of day. The means employed by a faithless trustee to change the form of trust property and to hide its equivalent from the beneficial owner in a general mass of assets should not be more powerful for iniquity than the conscience of a chancellor for justice. I have an abiding conviction that a proper disposition of the present case required adherence to the following rule of this court:

"Where a trustee mingles trust moneys with his own funds, *cestui que trust* is entitled to a charge upon the whole; and so long as any portion of the mass into which the trust fund has entered remains in any form, it is subject to such charge, and may be followed and claimed." *City of Lincoln v. Morrison,* 64 Neb. 822.

This rule of equity was stated by an oracle of wisdom and was deliberately adopted by a unanimous court. It does not set bounds to equitable relief, but adopts the principle that a claim for converted trust funds, indistinguishably mingled by a faithless trustee with general assets thus augmented, may be made a charge against the mass. The majority, instead of adhering to this classic in the literature of equity jurisprudence, followed its mere application by Doctor Pound to a mass of assets which did not include the equivalent of converted trust property. The growth of the remedy indicated by the rule last quoted was recognized as early as 1889 in an opinion by Chief Justice Fuller of the supreme court of the United States, who quoted with approval the following language:

"Formerly the equitable right of following misapplied money or other property into the hands of the parties receiving it depended upon the ability of identifying it; the equity attaching only to the very property misapplied. This right was first extended to the proceeds of the property, namely, to that which was procured in place of it by exchange, purchase, or sale. But if it became confused with other property of the same kind, so as not to be distinguishable, without any fault on the part of the possessor, the equity was lost. Finally, however, it has been held as the better doctrine that confusion does not destroy the equity entirely, but converts it into a charge upon the entire mass, giving to the party injured by the unlawful diversion a priority of right over the other creditors of the possessor." *Peters v. Bain,* 133 U. S. 670, 693.

The application of the rule stated in *City of Lincoln v. Morrison,* 64 Neb. 822, announced as it was by this court as a guiding principle of equity and justice, would have resulted in a decree allowing plaintiff's claim in preference to the claims of general creditors.

The proposition that the trust fund did not enter into the purchase of the bank building, furniture, fixtures or bills receivable, as a reason for not granting plaintiff the relief sought, will not stand the test of analysis or justify the failure to charge the mass of assets with plaintiff's claim. It destroys itself when reduced to a definite philosophy. The principal mediums of exchange in the business world are credits, commercial paper, checks, drafts and securities. Equity looks through the mere forms in which property is held to substance and reason for the purpose of dealing justly with conditions as they exist. Though the converted trust funds were not originally hid in or mingled with the kinds of property enumerated, the bank indebtedness was nevertheless reduced by the proceeds used for banking purposes. The general indebtedness with which those items of property were burdened was decreased to the extent of the trust fund wrongfully converted and used by the insolvent bank. The outstanding obligations of defendant

would have been greater to the extent of $4,467.23, when the receiver took charge, if they had not been reduced by the proceeds of the notes. The financial disaster of the insolvent bank might have occurred earlier, with still greater liabilities, except for the unlawful use of the converted proceeds in banking transactions. All that seems to me to be "manifest," in considering plaintiff's right to a preference over general creditors, is that it is immaterial whether the converted proceeds were used to purchase the bank building, furniture, fixtures and bills receivable or reduced the insolvent bank's indebtedness by which those items of property were burdened.

The same result is reached by another course of reasoning. Defendant is insolvent. Its assets are in the hands of a court of equity for the purpose of winding up its affairs and of distributing its assets among those entitled to them. Before distribution can be made the assets must be reduced to a common fund. Upon completion of that process all property, real, personal and mixed, must be reduced to money—a single fund in the hands of the receiver. Plaintiff's property, changed in form by fraud, is in that fund. No reason exists for separating the different kinds of property to make proof of plaintiff's right to a preference impossible and for uniting all assets in a common fund for distribution among general creditors.

The classification of plaintiff with general creditors is fundamentally wrong. Plaintiff is in a different class. Without any fault or neglect or suspicion of wrongdoing plaintiff confidingly entrusted its notes to defendant for collection in the due course of honest banking. Plaintiff by specific instructions in writing deliberately attempted to keep its notes and the proceeds thereof out of the defendant bank. It did not part with its title or ownership or become a depositor. The situation of the general creditors is entirely different. Their claims grew out of mutual contracts, legal deposits and other authorized transactions. Their funds, property, deposits and credits were entrusted to the bank under mutual contracts creating the relation of debtor

and creditor or of banker and depositor.  In view of this difference, it would be more reasonable, equitable and just to classify plaintiff as a preferred creditor.

The ruling of the majority that plaintiff cannot recover its trust proceeds without proof that they went into a specific fund or into an identified article of property in the hands of the receiver, after being traced into the general assets, does violence also to established rules of evidence.  It was the duty of defendant as trustee to disclose to the beneficiary what became of the trust property.  That duty was never performed.  The insolvent bank was required, under governmental control, to keep an account of its transactions. The law imposed on defendant as trustee the duty of telling where the trust funds went.  If they could be followed after being mingled with general assets into which they were traced by plaintiff, the banker was the person to make the proof and the equity court was the tribunal to require defendant to disclose the truth, if provable.  The holding that plaintiff was compelled to trace its property beyond the mass into a specific fund amounts to admitting the futility of equitable relief in a controversy like this between honest business and shocking fraud, both shown beyond the possibility of mistake.

Confidence in banks as collecting agencies will be impaired by the rules announced by the majority.  Millions in notes and drafts are transmitted daily by banks to other banks for collection.  With disturbed banking conditions and frequent bank failures commercial paper intended for collection only may, in a changed form, be diverted in a night to general creditors of insolvent banks and lost, if it must be traced into a specific fund or into an identified article of property as a condition of reclaiming it.  The general creditors are not entitled to the forbidden fruit of defendant's conversion.

I am authorized to say that Chief Justice Goss and Judge Day concur in this dissent.

EBERLY, J., concurring in the main opinion.

In this case we find a division of the court.  This situa-

tion we find reflected in the two conflicting views here presented. It seemed to the writer that a somewhat more detailed recital of the facts out of which the controversy arose than that set forth in either majority or minority opinion might be of assistance, not for the contradiction of either, but rather as supplementary to both.

All agree that the First National Bank of Gering (hereafter called the Gering bank) received from the Central National Bank (hereafter called the Lincoln bank) for "collection and return" a note of $714 and accrued interest, signed by J. L. Moore, a note of $1,537.50, signed by Henry T. Pfenning, and a note of $1,600, signed by Fred Miller. It is not questioned but what the Gering bank was, and is, an insolvent institution, and is now in charge of a federal receiver. While the extent of its insolvency may not definitely appear from the record before us, for the purpose of this discussion we will assume that its dividends to general creditors will not exceed 40 per cent.

Coming to the specific transaction out of which this litigation arose, it may be said that Moore and Pfenning were depositors of the Gering bank. After that bank had received the notes above described, on December 12, 1923, Pfenning's deposit account therein, then a credit balance amounting to $2,849.13, was charged with his note of $1,537.50 which was then past due. It cannot be gainsaid that for a banker to charge a past-due note of the maker to the deposit account of the maker is proper banking practice, and that thereafter notes thus charged are the property of the maker.

On December 20, 1923, Moore's deposit, then a credit balance of $1,214.73, was charged with $716.18, the amount of his note above referred to. Likewise, the note thus charged became the property of Moore. Corresponding credits were given by the Gering bank in the account of the Lincoln bank as the same appears in the books of that institution. When we examine the effects of the transaction, above outlined, upon the assets of the bank we find it to be nil. In other words, if it be conceived that immediate-

ly prior to each of these transactions, each piece of money, including pennies, nickels, dimes, quarters, halves, dollars, gold, paper, all cash items, in the bank till, personal property of every kind and description, and all real estate of the Gering bank had been branded and given an identifying number when these transactions were concluded, not a single number would be missing, nor would any be added. The physical properties thus constituting the actual assets of the bank, in possession of that institution, would be neither different or other at the conclusion of the transactions referred to than they were at their commencement.

It is to be remembered that the receipt of the notes above mentioned by the Gering bank, under the terms of the "Coll. and Ret." slip, imposed the duty to collect in "cash or actual equivalent." It could not then remit because it lacked cash. When the transactions between it and the makers of these obligations had been completed, the evidence affirmatively establishes it had failed to receive any "cash or the legal equivalent" thereon, out of which to satisfy the Lincoln bank. Therefore, its inability to comply with its duty still continued, and this condition remained when the federal receiver took possession of its assets.

True, the Gering bank, with the property of the Lincoln bank, paid and discharged a definite portion of its preexisting indebtedness. In so doing, two notes passed out of its possession to its general creditors who received them in payment of their dues. It cannot be said that the notes in question, thus made use of thereafter, were either in the Gering bank, or form any part of its assets.

Considered as a book transaction, as reflected by the books of the Gering bank, its effect was that as theretofore the Gering bank had been indebted to Moore in the sum of $716.18, and to Pfenning in the sum of $1,537.50, which indebtedness was worth not to exceed forty cents on the dollar, it now owes the Lincoln bank $2,253.68, likewise actually worth forty cents on the dollar. But Moore and Pfenning now have the notes which were originally of the value of $2,253.68.

On the other hand, no one questions the fact that the Gering bank had no right to convert these notes to its own use, and no right to insist upon the Lincoln bank accepting the credit thus given. This credit the Lincoln bank rejects. It now seeks a preference against the assets of the Gering bank based on this transaction.

The third note, that of Fred Miller, for the sum of $1,600 and interest, was not found by the receiver when he went into possession of the Gering bank. It does not appear to have been in this bank at the time of the closing of its doors. The evidence offered by the appellee, the Lincoln bank, disclosed that, probably it had been sold to one Winslow, who was a depositor of the Gering bank. The witness, whose deposition was taken, could not recall how the matter was handled, and could not state whether the Gering bank received any property whatsoever, save and except possibly a check upon itself.

It must be conceded, however, as to the last transaction, there is nothing in the record which discloses affirmatively that the Gering bank received or had in its possession at the time it failed any property resulting from, or traceable to, this Miller transaction.

It has been suggested that *Peters v. Bain,* 133 U. S. 670, furnishes a proper rule for the guidance of this court in the present case. The facts in that case are numerous and involved. However, a careful analysis and condensation produces the following result: Portsmouth, Virginia, is separated from Norfolk, Virginia, by the Elizabeth river. Bains were private bankers who conducted their banking and brokerage business at Portsmouth. As stockholders and officers they also controlled a national bank at Norfolk. Over a period of time, in an unlawful manner, the Bains of Portsmouth, by various devices, secured improper loans from the national bank of Norfolk aggregating $1,443,-462.99. This amount, due to the unlawful manner in which it was obtained, possesses all the qualities of a trust fund and was so treated by all the courts. This money, in the

Central Nat. Bank v. First Nat. Bank.

course of business, the Bains mingled with that which they obtained from other sources.

On April 2, 1885, the comptroller of the currency took possession of the Norfolk bank. The Bain bank at Portsmouth immediately closed its doors because of insolvency. The Bains of Portsmouth, as partners and individuals, then made an assignment to trustees for the benefit of their creditors. The national bank receiver brought suit in equity claiming that a trust in the assigned property resulted from the unlawful loans to the Bains. The trustees named in the assignment, due to notice with which they were chargeable, were held by all the courts to have obtained no greater rights than the Bains possessed, and that the property in their hands was subject to the same rules that it would have been, had no assignment been made.

This case was first tried in the circuit court of appeals, Mr. Chief Justice Waite of the United States supreme court and the circuit judges of that circuit then presiding. The result of the trial was that as to the certain specific property it was adjudged that the receiver was entitled to preference, and as to other items of property this relief was denied.

The reasons for the determination appear in the following excerpts of the decision of the circuit court of the United States: "As to the trust resulting to the (national) bank by reason of the wrongful and unlawful use of its funds by its officers in the purchase of property for the firm or the several members thereof, this branch of the case divides itself into two parts, the first relating to property which was purchased with moneys that can be identified as belonging to the (national) bank; and, second, to that which was bought and paid for by the firm out of the general mass of moneys in their possession, and which may or may not have been made up in part of what had been wrongfully taken from the (national) bank. As to the first of these classes of property we entertain no doubt that the trust exists, and that it may be enforced by the receiver. * * * The property in the second class, however, occupies

a different position. There the purchases were made with moneys that cannot be identified as belonging to the bank. The payments were all, so far as now appears, from the general fund then in the possession and under the control of the firm (Bain Bros.). Some of the money of the (national) bank may have gone into this fund, but it was not distinguishable from the rest." Reported in *Peters v. Bain,* 133 U. S. 670, 678.

In other words, the report of this case discloses that all property of the Bains into which the evidence failed to affirmatively establish that trust funds had entered was placed by the circuit court of the United States in the second class, as to which preferential rights were denied the bank's receiver.

This disposition of the case was, by the supreme court of the United States, on appeal, "in all things, affirmed." The opinion was delivered by Fuller, C. J., and during its course he quoted the language of Mr. Justice Bradley in *Freling-huysen v. Nugent,* 36 Fed. 229, with reference to the very claim then being made by the national bank receiver that he was entitled to a lien as a preferred claim against the mass of the assets of the Bains, notwithstanding he had been unable to prove that the items of property of which this mass was composed was purchased by the funds obtained from the national bank. In other words, the receiver had failed to trace the funds. In the discussion of the receiver's claim the language appearing in the dissenting opinion was quoted, but the portion quoted in the dissenting opinion in this case is incomplete for the reason that the quotation, as made by Fuller, C. J., extended beyond what appears in our minority opinion. To aid in the full understanding of the quotation complete, we will indicate the portion of Justice Bradley's language omitted in the dissenting opinion by italics, and supply the language made use of by Chief Justice Fuller in capitals: "It was said by Mr. Justice Bradley in *Frelinghuysen v. Nugent,* 36 Fed. 229: 'Formerly the equitable right of following misapplied money or other property into the hands of the parties re-

ceiving it depended upon the ability of identifying it; the equity attaching only to the very property misapplied. This right was first extended to the proceeds of the property, namely, to that which was procured in place of it by exchange, purchase, or sale. But if it became confused with other property of the same kind, so as not to be distinguishable, without any fault on the part of the possessor, the equity was lost. Finally, however, it has been held as the better doctrine that confusion does not destroy the equity entirely, but converts it into a charge upon the entire mass, giving to the party injured by the unlawful diversion a priority of right over the other creditors of the possessor. *This is as far as the rule has been carried. The difficulty of sustaining the claim in the present case is that it does not appear that the goods claimed—that is to say, the stock on hand, finished and unfinished—were either in whole or in part the proceeds of any money unlawfully abstracted from the bank.'* THE SAME DIFFICULTY PRESENTS ITSELF HERE, AND WHILE THE RULE LAID DOWN BY MR. JUSTICE BRADLEY HAS BEEN RECOGNIZED AND APPLIED BY THIS COURT, NATIONAL BANK V. INSURANCE COMPANY, 104 U. S. 54, 67, AND CASES CITED, YET, AS STATED BY THE CHIEF JUSTICE, 'PURCHASES MADE AND PAID FOR OUT OF THE GENERAL MASS CANNOT BE CLAIMED BY THE BANK, UNLESS IT IS SHOWN THAT ITS OWN MONEYS THEN IN THE FUND WERE APPROPRIATED FOR THAT PURPOSE.' " *Peters v. Bain,* 133 U. S. 670, 693.

It would seem that this decision as an entirety is in complete accord with the majority opinion in the instant case. Indeed, it appears that the doctrine announced in the majority opinion in this instant case is neither new in pronouncement nor novel in application. In *State v. Bank of Commerce,* 54 Neb. 725 (April 21, 1898) ; *Morrison v. Lincoln Savings Bank & Safe Deposit Co.,* 57 Neb. 225 (December 22, 1898) ; *City of Lincoln v. Morrison,* 64 Neb. 822 (May 21, 1902), is involved the tracing of trust funds, and the result attained in each of these proceedings, in view of the facts involved, is entirely inconsistent with the con-

tention of the dissenting opinion, but entirely consistent with the reversal directed in this case.

In each of the three Nebraska cases last named, action was brought by the *cestui que trust* to enforce claims of preference against the assets of an insolvent's trustee because of trust funds which were, or might have been, used or applied by insolvents in payment or discharge of general indebtedness. In at least two the facts involved were the use of trust funds in payment by insolvent banks of the preexisting depositors. Without qualifications, preferential rights based on these claims thus paid were, in every instance, denied by this court, and, as to trust funds thus disposed of, the *cestui que trust* was held to possess only the rights of a general creditor and to be wholly without preference.

In fact, these deductions plainly appear, not only in the body of these decisions, but in the syllabi of the cases referred to. Thus, in *City of Lincoln v. Morrison, supra,* appears the following: "Misappropriation of a trust fund does not entitle *cestui que trust,* merely as such, and for that reason alone, to a preference over general creditors of an insolvent trustee." "But if the whole of such fund, or a greater portion thereof than that representing the trustee's own money is used by an insolvent trustee in paying his debts, *cestui que trust* is not entitled to a preference over general creditors for the amount of his money so lost. * * * *Capital Nat. Bank v. Coldwater Nat. Bank,* 49 Neb. 786, and *State v. Midland State Bank,* 52 Neb. 1, limited. *State v. Bank of Commerce,* 54 Neb. 725, and *Morrison v. Lincoln Savings Bank & Safe Deposit Co.,* 57 Neb. 225, adhered to."

"A person asserting a claim for preference against an insolvent estate has the burden of showing that such estate has been increased, to some extent, by the misappropriation of trust funds or property belonging to the claimant." *Morrison v. Lincoln Savings Bank & Safe Deposit Co.,* 57 Neb. 225.

In view of the substantial accord which prevails among the great majority of jurisdictions on the principles announced and applied by the majority opinion in the instant case, what changed conditions, if any, are now in existence which would justify this court in now abandoning the doctrine deliberately accepted and approved and permanently adopted by a line of decisions made almost three decades ago? The legislative branch of our state government has announced no disapproval. That progress in civilization may necessitate change in judicial concept and pronouncement to enable the judiciary to conform to advancing civilization may be conceded. Even so, in order to justify the overruling of a former decision deliberately made, this supreme court should be convinced, not merely that the case was wrongly decided, but that less injury will result from overruling than from following it. *City of Wahoo v. Nethaway*, 73 Neb. 54. We are convinced that the judgment of reversal is manifestly correct, and that most serious injuries would result from a departure from the doctrine announced.

Because of the established course of business, the principles we are here considering find their usual, but not necessarily their exclusive, application to insolvent banks. In Nebraska, as elsewhere, we have state banks controlled by the state law, and national banks organized under federal statutes. It must be conceded that both of these branches are important factors in the state prosperity and that each is entitled to equality and identity of treatment in the application of our laws to the business situation in which they are interested. Neither should be preferred, both should be treated equally and no condition should be permitted to exist or be brought into being by judicial decision which would result in discrimination against either.

With reference to rights and liabilities arising out of transactions in negotiable paper, there should certainly be no condition permitted which would result in having one law for the national bank and another law for the state bank.

It is to be remembered that in the case before us the insolvent bank is a national bank. A national bank is an instrumentality of the United States subject to its paramount authority, subject to state jurisdiction, regulation, and control only to the extent and in the manner expressly permitted by congress. *M'Culloch v. Maryland,* 4 Wheat. (U. S.) *316; Osborn v. Bank of United States,* 9 Wheat. (U. S.) 738; *Van Allen v. Assessors,* 3 Wall. (U. S.) 573; *Lionberger v. Rouse,* 9 Wall. (U. S.) 468; *People v. Weaver,* 100 U. S. 539; *Davis v. Elmira Savings Bank,* 161 U. S. 275; *Owensboro Nat. Bank v. Owensboro,* 173 U. S. 664; *First Nat. Bank of Gulfport v. Adams,* 258 U. S. 362; *Bank of California v. Richardson,* 248 U. S. 476; *Des Moines Nat. Bank v. Fairweather,* 263 U. S. 103; *First Nat. Bank of Guthrie Center v. Anderson,* 269 U. S. 341.

By federal statute, on the insolvency of the national bank, one of the executive departments of our federal government, by its agents, takes possession of it and its assets, and by this action its receiver, appointed by this department, and its assets are wholly withdrawn from the jurisdiction of the state courts, except in so far as such jurisdiction is permitted by federal enactment. True, the provisions of the federal statute authorizing a suit in state courts against national banking associations exist. But, even so, they contain the exception: "The provisions of this section shall not be held to affect the jurisdiction of the courts of the United States in cases commenced by the United States or by direction of any officer thereof, or cases for winding up the affairs of any such bank." 24 St. at Large, ch. 373, sec. 4, p. 555.

A receiver of an insolvent bank is an officer of the United States within the meaning of section 563, Rev. St. U. S., which gives the district court jurisdiction of all lawsuits at common law brought by the United States or any officer thereof authorized by law to sue.

So, too, it has been held that a suit against the receiver of a national bank to compel him to pay out of the funds in his hands moneys claimed by the complainant is a. suit

arising under the laws of the United States and can be re-
moved into the federal court. *Hot Springs Independent
School District v. First Nat. Bank,* 61 Fed. 417; *Jewett v.
Whitcomb,* 69 Fed. 417.

It therefore follows that, ordinarily, when cases are com-
menced against the federal receiver in a state court, the
receiver may exercise the option of having the action tried
in a federal tribunal if he so desires. We have already seen
that the doctrine of the supreme court of the United States
on the question now before us, as announced in *Peters v.
Bain, supra,* is almost identical with the majority opinion
in this case. It appears, too, that the federal courts have
not departed from the path traced in the last-named case,
but are still in substantial harmony with the present Ne-
braska doctrine.

This fact appears beyond question in the recent case of
*Farmers Nat. Bank v. Pribble,* 15 Fed. (2d) 175, decided
September 13, 1926, opinion by Walter H. Sanborn, Circuit
Judge. The facts in this case were that the Farmers Na-
tional Bank held for collection for Pribble a sight draft on
an elevator company with bill of lading attached. The ele-
vator company paid this draft by its check of $1,046.89 on
a third bank situated in the same town. In accordance with
local custom there was a daily clearance between the local
banks, and the Farmers National Bank, two days before its
failure, exchanged this check of $1,046.89 with the third
bank for checks drawn upon itself. The difference in this
transaction was $115.13 due the third bank. This was paid.
It thus appears that no actual money or property came into
the Farmers National Bank, but unquestionably the
$1,046.89, by the clearance, was applied by it in discharge of
its own indebtedness. Pribble claimed a preference under
this state of facts, but it was denied by the federal receiver,
which action was sustained by the circuit court of appeals.
The important point presented in our instant case was there
expressly decided. The court held: "It is indispensable to
the maintenance by a *cestui que trust* of a claim to prefer-
ential payment (by a receiver) out of the proceeds of the

estate of an insolvent that clear proof be made that the trust property or its proceeds went into a specific fund or into a specific identified piece of property which came to the hands of the receiver, and then the claim can be sustained to that fund or property only, and only to the extent that the trust property or its proceeds went into it. It is not sufficient to prove that the trust property or its proceeds went into the general assets of the insolvent estate and increased the amount and value thereof which came to the hands of the receiver." See, also, *Empire State Surety Co. v. Carroll County,* 194 Fed. 593, and cases cited; *Beard v. Independent District of Pella City,* 88 Fed. 375; *In re Seven Corners Bank,* 58 Minn. 5; *American Can Co. v. Williams,* 176 Fed. 816; *Willoughby v. Weinberger,* 15 Okla. 226; *Macy v. Roedenbeck,* 227 Fed. 346, L. R. A. 1916C, 12; *Central Trust Co. v. Chicago, A. & N. R. Co.* 232 Fed. 936; *State Bank of Winfield v. Alva Security Bank,* 232 Fed. 847; *Titlow v. McCormick,* 236 Fed. 209; *Zenor v. McFarlin,* 238 Fed. 721; *Scullin Steel Co. v. North American Co.,* 255 Fed. 945; *Mechanics & Metals Nat. Bank v. Buchanan,* 12 Fed. (2d) 891.

Also, "The doctrine that a *cestui que trust* whose property had helped to swell the general assets of a corporation which was or became insolvent has a prior right to or interest in those general assets, without specific identification and tracing of such claimant's property, was again expressly repudiated and denied by this court in the case last cited. The fact that the claimant's property paid or reduced the indebtedness or liability of the insolvent corporation, so that it will pay a larger percentage of its debts, justifies no lien on its assets by or preference in payment to the *cestui que trust* (1) because such a reduction of indebtedness does not increase the property or the value of the property of the insolvent; and (2) because the property of the claimant so used to pay a part of the insolvent's general indebtedness or liability never goes into, and therefore cannot be traced into, the property or assets of the insolvent which subsequently come into the possession of the receiver."

Central Nat. Bank v. First Nat. Bank.

*Farmers Nat. Bank v. Pribble, supra; Titlow v. McCormick, supra; American Can Co. v. Williams, supra; Lucas County v. Jamison,* 170 Fed. 338; *Multnomah County v. Oregon Nat. Bank,* 61 Fed. 912; *Beard v. Independent District of Pella City, supra; Hecker-Jones-Jewell Milling Co. v. Cosmopolitan Trust Co.,* 242 Mass. 181, 24 A. L. R. 1148.

In discussing these propositions, Sanborn, Circuit Judge, says: "The argument that the use of a trust fund by an insolvent trustee to diminish its indebtedness is equivalent to the use of it to add specific and traceable property to its assets is fallacious. The indispensable requisite of a trust in cases of this kind is the ability to take out of the property of the insolvent a traceable, identified part of it, which the insolvent, in violation of its duty as a trustee, has put into it. In a simple case the radical difference is plain. If an insolvent has assets worth $5,000 and owes $10,000, and, in violation of its trust, it puts into its assets government bonds of its *cestui que trust* worth $5,000, the *cestui que trust* may recover these bonds or their traceable proceeds, because such a recovery theoretically does not diminish the assets the insolvent rightfully held, nor deprive its general creditors of their recourse to that property. The $5,000 of assets which it had remains, and is still available for the general creditors after the withdrawal of the $5,000 of trust money which was added to the assets. But, if part of such insolvent's indebtedness of $10,000 is its promissory note of $5,000, and if, in violation of its duty, it uses the bonds or money of its *cestui que trust* to pay and does thereby pay that note thereby reducing its indebtedness to $5,000, and the trust-money at the suit of the *cestui que trust* is then taken out of the $5,000 of assets, there then remains nothing to pay the general creditors, who by such a proceeding lose the 50 per cent. of their claims which they would have received out of the $5,000 of assets the debtor had before the $5,000 of its indebtedness was paid by the $5,000 of trust money." *Farmers Nat. Bank v. Pribble,* 15 Fed. (2d) 175.

In this connection, it may be interesting to quote the words of Judge Sanborn in the discussion of the language of Mr. Justice Bradley, from whose opinion in *Frelinghuysen v. Nugent*, 36 Fed. 229, as previously explained, the minority dissenting in this case, have quoted a portion. Judge Sanborn, with reference to this case, says: "Mr. Justice Bradley, from whose opinion in *Frelinghuysen v. Nugent*, 36 Fed. (C. C.) 229, counsel for the plaintiff quote some general statements relative to trusts, did not in that case decide or adopt the theory that the unlawful use of trust money by a trustee in violation of its trust vested in its *cestui que trust* a like right to its recovery from its receiver that the deposit of it and adding its value to the assets of the insolvent might have created. Justice Bradley held in that case that no trust *ex maleficio* was proved. In *American Can Co. v. Williams*, 178 Fed. 420, cited by plaintiff, the court held that the identification and tracing of the trust funds into the hands of the receiver or other person from whom it was to be taken was essential to the recovery thereof from such receiver. It is not denied that decisions and opinions of courts have been rendered to the effect that a *cestui que trust* may have payment of claims for trust funds from the receivers of assets of insolvents in preference to their general creditors without identification or tracing, and that they may have such payments because trust funds were used to pay some of the debts of the insolvent; but those opinions are not in accord with the established principles, rules, and practice in equity in the courts of the United States, or with the great weight of authority throughout the United States." *Farmers Nat. Bank v. Pribble, supra.*

In the concluding paragraph of this opinion, Judge Sanborn further says: "Our conclusion is that the plaintiff in this case failed to prove two indispensable requisites to his alleged cause of action: First, that his draft for $1,046.89 or its proceeds ever went into a specific identified piece of property or fund or funds which were in the hands of the Farmers' Bank when it closed on May 12, 1924; and, second,

that such draft or its proceeds ever went into a specific identified piece of property or fund in the hands or control of the defendant, the receiver." *Farmers Nat. Bank v. Pribble, supra.*

In view of the authorities quoted, and the reasons upon which they are based, the acceptance of the proposal contained in the dissenting opinion is wholly impossible. Obviously, the modification of the rule, there sought, that previously obtained in this jurisdiction would confer on the claimants a preference right which has heretofore been denied them, not only in the state courts of Nebraska, but in the federal tribunals as well.

It may be conceded that the changes advocated would be exceedingly beneficial to one class of claimants. On the other hand, it would be exceedingly prejudicial to the general depositor and the general creditor.

In the case of state banks, the full force and full effect of this new doctrine, if adopted, would extend not only to the insolvent institutions, but would include the guaranty fund and all in any way interested therein. You cannot remove assets of an insolvent state institution upon the excuse of preferred right thereto without depriving both the state bank and the guaranty fund of their just recourse for advances made for the benefit of a general depositor thereof.

The injustice to the state banks, however, would not end here. They would have no escape from the law as we interpret it, while a federal court or receiver of an insolvent national bank would have. It is quite plain that if an action were commenced against the federal receiver to enforce a claim of preference in a state court, as we have already seen by the authorities cited, proper steps timely taken could secure a removal of such suit to the federal district court where justice would be administered in accordance with the federal rule and in entire disregard of any contrary determination the state courts might make. In other words, if we assume the adoption of the proposition contained in the dissenting opinion, the federal court would be to the

federal receiver the city of refuge, and to them would naturally and inevitably be removed for trial all cases involving preference to assets in his hands. The result of this would be that, in the event of identical claims to preference, one in favor of the state bank and against an insolvent national bank would be denied by the federal tribunal; and the identical claim in favor of a national bank and against an insolvent state institution would be enforced by the state court. So, the adoption of the rule presented in the minority opinion, in view of the situation and of plurality of jurisdiction, would result in a manifest and substantial discrimination against our own state institutions.

Justice can never be promoted by the creation of conditions through judicial action which necessitate one rule for state institutions and another rule for federal corporations. Discrimination and inequality furnish no permanent foundation for confidence, nor do they promote prosperity, nor tend to advance the interest of trade and commerce. The rule adhered to in the majority opinion has the virtue of universality, and is, in effect, the rule now enforced in both federal and state courts. Under it no favored class exists. There is the same rule for the state bank and the national bank, irrespective of the jurisdiction in which the case may be tried.

Conceding to the new proposition advocated by the minority full force and effect of the reasoning with which it is sustained, we are constrained to the belief that it is not in accord with the authorities cited in its support, and we are compelled to accept, in accord with enlightened public policy, precedent, authority, and reason, the opinion of Good, J., which has been adopted by the majority of this court.

The following opinion on motion for rehearing was filed November 10, 1927. *Former judgment of reversal vacated, and judgment of district court affirmed.*

1. **Trusts:** NOTES: COLLECTION BY BANK. A bank that receives

Central Nat. Bank v. First Nat. Bank.

and accepts a promissory note for the sole purpose of collecting the debt and remitting the proceeds is a trustee and as such is accountable to the beneficiary.

2. ———: ———: CONVERSION. A mere change in the form of property confided to and converted by a trustee does not change the ownership, the beneficiary remaining the owner.

3. ———: ———: FOLLOWING PROCEEDS. Where the form of trust property is changed by a fiduciary and the resulting proceeds are wrongfully mingled by him with the mass of assets comprising his insolvent estate, the beneficiary of the trust, in a proper case, may resort to the mass for redress, if augmented by the trust property.

4. ———: ———: ———. The proceeds of commercial paper received by a bank as trustee and wrongfully credited to the owner, if equivalent to money for banking purposes, may, in equity, be treated as money.

5. ———: ———: ———. Where proceeds of a note are converted by a bank as trustee, a credit to the beneficiary therefor on its books may be evidence of a credit equivalent to money.

6. Banks and Banking: CONVERSION OF TRUST PROPERTY. The conversion of trust property by a bank and credit to the beneficiary therefor on its books, contrary to instructions, without the knowledge of the beneficiary, do not necessarily create the relation of banker and depositor.

7. ———: ———: INSOLVENCY: PREFERENCE. The proceeds of a note entrusted to a bank for the sole purpose of collecting and returning the amount due thereon may be traced as trust funds into the general assets of the bank after it has been closed on account of insolvency and such funds may be made the basis of a preferred claim against the general assets of the bank, where it is shown that the note was collected, that the proceeds were converted by the bank and wrongfully credited to the beneficiary without the latter's knowledge, and that the fund was mingled with the mass of assets used for general banking purposes, thus augmenting the general assets.

8. ———: ———: ———: ———: BURDEN OF PROOF. Where the beneficiary of a trust, in an action to establish a preferred claim as a charge against the general assets of an insolvent bank in the hands of a receiver, traces the trust fund through conversion of the bank into the mass of its assets, the

burden of proof is on the receiver who has control of the bank records and accounts to prove that the assets were not augmented by the conversion or that the trust fund disappeared from the assets, if the defense is based on those grounds. .

Heard before Goss, C. J., Rose, Dean, Day, Good, Thompson and Eberly, JJ.

Rose, J.

This is a suit in equity to trace proceeds of notes into a national bank subsequently closed on account of insolvency and to establish a preferred claim payable in full from general assets in the hands of the receiver.

The Central National Bank of Lincoln is plaintiff. The First National Bank of Gering, hereinafter called "the bank," and its receiver are defendants. While the bank was transacting a commercial banking business under the laws of the United States, it received from plaintiff four promissory notes for the exclusive purposes of collecting the amount due on each and of returning the proceeds to plaintiff. For these purposes plaintiff transmitted and the bank received the note of Fred Miller for $1,600, interest $80, total $1,680; the note of Henry Pfenning for $1,500, interest $37.50, total $1,537. 50; the note of J. L. Moore for $700, interest $14, total $714; the note of George Schnell for $1,000, interest $25, total $1,025. The Miller note was transmitted November 3, 1923, and the others were transmitted November 30, 1923. Each note matured on or before December 5, 1923. Plaintiff owned all of these notes which, with interest, aggregated $4,956.50. In addition to the facts stated, the petition contains in substance pleas that the bank collected the debts evidenced by these notes, converted the proceeds thereof, mingled plaintiff's funds with the general assets of the bank, used them for banking purposes, never returned or paid any part of them to plaintiff, became insolvent, reduced the cash in the bank to $1,370.42, and went into the hands of a receiver, its doors not being open for commercial banking after Decem-

ber 31, 1923. The equitable relief sought by plaintiff is the establishment of a preferred claim for $4,956.50 payable in full from the general assets of the bank in the hands of the receiver.

The answer, among other things, denies material facts upon which the petition for a preference over general creditors is based and challenges the right of plaintiff to charge the mass of assets in the hands of the receiver with the proceeds of the notes.

From the standpoint of each side the facts were well pleaded and the principal contest at the trial in the district court grew out of a controversy as to the right of plaintiff to a preference over general creditors without tracing the proceeds of the notes into specific funds or property. On this feature of the case the trial court found that the Schnell note fell into the hands of the receiver and that the proceeds of the other notes were appropriated by the bank and were mingled with its assets, thus becoming a charge upon the mass. Consequently the receiver was ordered to return the Schnell note to plaintiff and to pay the latter, out of the general assets, $4,467.23, the amount of principal and interest due on the notes collected by the bank. From the decree of the district court defendants appealed.

The controlling question presented by the appeal has been vigorously argued on three different occasions by counsel for all litigants and at the third hearing a valuable brief was submitted by other counsel acting in the capacity of a friend of the court. With commendable frankness counsel for the receiver and the bank stated in the first instance in his brief the question for determination as follows:

"We are willing to rest this case on the broad general principle that the appellee has not traced its notes into any particular fund or property of the First National Bank and therefore is not entitled to a preferred claim of any kind."

The same proposition was repeated in open court. Oppos-

ing counsel accepted the challenge as a correct statement of
the controlling question, conceded that the proceeds of the
notes had not been traced into any specific fund or prop-
erty in the hands of the receiver and argued nevertheless
that the trial court properly charged the mass of the bank's
assets with plaintiff's claim.   In considering the merits
of the appeal at a former term the majority of this court
delivered an opinion stating correctly the question for solu-
tion in the following language:

"Plaintiff's action is based on the assumption that the
proceeds of the three notes in controversy were mingled
with the general assets of the bank, and that they aug-
mented the assets which came into the possession of the re-
ceiver, to the extent of the amount of the proceeds of such
notes, and that, therefore, plaintiff is entitled to have its
claim allowed as preferred and payable from the general
assets of the bank in the hands of its receiver.   The de-
fense of the receiver proceeds on the theory that the pro-
ceeds of the three notes have not been traced by the plain-
tiff into any specific property that came into the receiver's
possession."   Central Nat. Bank v. First Nat. Bank, ante,
p. 444.

The reduction of the problem to this form is a premise
established by all litigants and accepted by the court.   It
is a recognition of the fact that the proceeds of plaintiff's
notes were traced into the general assets of the bank—a
conclusion properly drawn from the evidence.   That the
assets were augmented by proceeds of the notes is also a
proper deduction from the evidence.

The members of this court, like courts eleswhere, are
divided on the proper solution of the question.   The rulings
are in hopeless conflict.   In the present case the majority
in the former opinion held:

"A trust fund may be followed and recovered in equity
by the beneficiary, as against the trustee or his general
creditors, either in its original or substituted form, when,

and only when, it can be traced to and identified in some specific fund or property.

"One seeking, in equity, the allowance of a claim for preference against an insolvent bank in the hands of a receiver has the burden of proving that his trust fund either came into the possession of the receiver, or was invested in some specific fund or property that came into the hands of the receiver." *Central Nat. Bank v. First Nat. Bank, ante,* p. 444.

These rulings resulted in a reversal of the decree, from which defendants appealed, but there was a dissenting opinion in which three members of the court joined. *Central Nat. Bank v. First Nat. Bank, ante,* p. 451.

Upon a motion by plaintiff for a rehearing, the case was again argued and submitted. In the light of new briefs, rearguments, further research and deliberation, four members of the court entertain the view that the dissenting opinion contains the better solution of the question presented by the appeal, and it is therefore adopted as the opinion of the court. Without repeating the reasons for the dissent, the principles based thereon and now adopted are as follows:

1. A bank that receives and accepts a promissory note for the sole purpose of collecting the debt and remitting the proceeds is a trustee and as such is accountable to the beneficiary.

2. A mere change in the form of property confided to and converted by a trustee does not change the ownership, the beneficiary remaining the owner.

3. Where the form of trust property is changed by a fiduciary and the resulting proceeds are wrongfully mingled by him with the mass of assets comprising his insolvent estate, the beneficiary of the trust, in a proper case, may resort to the mass for redress, if augmented by the trust property.

4. The proceeds of commercial paper received by a bank as trustee and wrongfully credited to the owner, if

equivalent to money for banking purposes, may, in equity, be treated as money.

5.   Where proceeds of a note are converted by a bank as trustee, a credit to the beneficiary therefor on its books may be evidence of a credit equivalent to money.

6.   The conversion of trust property by a bank and credit to the beneficiary therefor on its books, contrary to instructions, without the knowledge of the beneficiary, do not necessarily create the relation of banker and depositor.

· 7.   The proceeds of a note entrusted to a bank for the sole purpose of collecting and returning the amount due thereon may be traced as trust funds into the general assets of the bank after it has been closed on account of insolvency and such funds may be made the basis of a preferred claim against the general assets of the bank, where it is shown that the note was collected, that the proceeds were converted by the bank and wrongfully credited to the beneficiary without the latter's knowledge, and that the fund was mingled with the mass of assets used for general banking purposes, thus augmenting the general assets.

8.   Where the beneficiary of a trust, in an action to establish a preferred claim as a charge against the general assets of an insolvent bank in the hands of a receiver, traces the trust fund through conversion of the bank into the mass of its assets, the burden of proof is on the receiver who has control of the bank records and accounts to prove that the assets were not augmented by the conversion or that the trust fund disappeared from the assets, if the defense is based on those grounds.

The former opinion is overruled, the reversal set aside, and the judgment of the district court is

AFFIRMED.

GOOD, THOMPSON, and EBERLY, JJ., dissenting.
We respectfully dissent from the decision of the present

majority opinion of this court in this case, from the reasoning upon which the decision proceeds, and from the statement of facts set forth therein upon which it purports to be based. We desire to announce our adherence to the views of the law heretofore expressed by Good, J., in *Central Nat. Bank v. First Nat. Bank, ante,* p. 444, as applicable to this controversy, and reiterate the statement as to law and facts set forth in the concurring opinion in this case, *Central Nat. Bank v. First Nat. Bank, ante,* p. 457.

Preliminary to a further discussion of the imperative reasons which compel us to continue our opposition to the rule announced by the majority, it may be said that this is an equitable proceeding tried here *de. novo;* that the sole parties to the original transaction which furnishes the foundation of this litigation were a national bank in Lincoln, Nebraska, and a national bank in Gering, Nebraska. The parties litigant now before us are the national bank in Lincoln, Nebraska, and a receiver of the Gering bank properly appointed by the United States comptroller of currency at Washington, D. C. The comptroller of currency, under and pursuant to the provisions of the national bank act, and prior to the commencement of this action, took possession of all of the assets of the Gering bank then wholly an insolvent institution which closed its doors December 31, 1923. At that time the facts, as contained in the record, indicate that, with the exception of one note which is not a matter of dispute here, none of the physical properties embraced in the claim of the Lincoln bank, or any of their actual proceeds, formed any part of the assets of that institution.

The majority opinion admits, as all litigants agree, that the record before us wholly fails to identify any of the property constituting the foundation of plaintiff's suit, or any of the proceeds thereof, as part or whole of any specific assets which reached the possession of the representative of the comptroller when this bank was taken over by that department.

As to three items of property then carried on the books of the Gering bank as "Real estate, $11,940," "Furniture and fixtures, $4,906.25," "Other real estate, $14,000," it is conceded that they became the property of the Gering bank long prior to the transactions before us; that, under the circumstances of the case, it was a physical impossibility for the property in suit, or of any of the proceeds thereof, to have entered into, or to have become incorporated in, any of the properties above named, or in the consideration parted with by the Gering bank for the same.

The majority opinion accords the Lincoln bank a preference against all the assets of the Gering bank, including even the items of real and personal property last set out, and makes the claim of that bank a prior charge and an equitable lien against the same. As bearing on the reasons upon which the majority opinion is based, attention is called to the following excerpt: "The proposition that the trust fund did not enter into the purchase of the bank building, furniture, fixtures or bills receivable, as a reason for not granting plaintiff the relief sought, will not stand the test of analysis or justify the failure to charge the mass of assets with plaintiff's claim. It destroys itself when reduced to a definite philosophy. The principal mediums of exchange in the business world are credits, commercial paper, checks, drafts and securities. Equity looks through the mere forms in which property is held to substance and reason for the purpose of dealing justly with conditions as they exist. Though the converted trust funds were not originally hid in or mingled with the kinds of property enumerated, the bank indebtedness was nevertheless reduced by the proceeds used for banking purposes. The general indebtedness with which those items of property were burdened was decreased to the extent of the trust fund wrongfully converted and used by the insolvent bank. The outstanding obligations of defendant would have been greater to the extent of $4,467.23, when the receiver took

charge, if they had not been reduced by the proceeds of the notes. The financial disaster of the insolvent bank might have occurred earlier, with still greater liabilities, except for the unlawful use of the converted proceeds in banking transactions. All that seems to me to be 'manifest', in considering plaintiff's right to a preference over general creditors, is that it is immaterial whether the converted proceeds were used to purchase the bank building, furniture, fixtures and bills receivable or reduced the insolvent bank's indebtedness by which those items of property were burdened." *Central Nat. Bank v. First Nat. Bank, ante,* p. 451, 455.

True, the language just quoted appears in the former dissenting opinion by Rose, J., but the following also appears in the present majority opinion: "Four members of the court entertain the view that the dissenting opinion contains the better solution of the question presented by the appeal, and it is therefore adopted as the opinion of the court."

In this connection also appears in the majority opinion the further statement: "That the assets were augmented by proceeds of the notes is also a proper deduction from the evidence."

While it is deemed that the conclusion last stated is refuted by the facts as detailed in the opinion by Good, J., and in the concurring opinion by Eberly, J., no good can be served by their further discussion.

However, a careful examination of the majority opinion, especially in view of the language of Rose, J., quoted, inevitably leads to the conclusion that we have before us a recrudescence of the philosophy and principles promulgated in the once leading, but now overruled, and almost universally discredited, case of *McLeod v. Evans,* 66 Wis. 401. The result arrived at, the controlling principles announced, and application made to the facts as assumed to be reflected by the record in the Wisconsin court, are in all respects

identical with the majority opinion in the present case. Cole, C. J., in that opinion says in part: "The conclusion is irresistible, from the facts, that the proceeds of the trust property found its way into Hodges' (the insolvent trustee) hands, and were used by him either to pay off his debts or to increase his assets. In either case, it would go to the benefit of his estate. * * * We do not understand that it is necessary to trace the trust fund into some specific property in order to enforce the trust." Accordingly, that court awarded a lien by preference for the entire amount received by Hodges.

But, as set forth in the former majority opinion by Good, J., in this case, this doctrine was expressly overruled in *Nonotuck Silk Co. v. Flanders,* 87 Wis. 237. Without further discussion we will content ourselves with a reference to note in 3 Pomeroy, Equity Jurisprudence (4th ed.) 2386, sec. 1049, where, after stating the rule as announced in the opinion by Good, J., it continues: "The contrary holding confuses the lien with the trustee's personal liability. Such confusion is harmless in its results when the trustee is solvent; but where his assets are insufficient to pay his debts, the question becomes important as between the beneficiary and the general creditors. To extend the lien in such case to the general mass of the trustee's assets is to pervert the character of the personal liability of the trustee, —a 'simple' equitable debt,—and to render the *cestui que trust* a preferred creditor, irrespective of his inability to establish any right of property in a specific portion of the trustee's estate. Such, however, was the result attained, for a time, by the decisions in a group of western states, nearly all of which have since been repudiated by the courts which rendered them: *McLeod v. Evans,* 66 Wis. 401, 57 Am. Rep. 287 (but see *Nonotuck Silk Co. v. Flanders,* 87 Wis. 237; *Burnham v. Barth,* 89 Wis. 362); *Davenport Plow Co. v. Lamp,* 80 Ia. 722, 20 Am. St. Rep. 442 (but see *Bradley v. Chesebrough,* 111 Ia. 126; compare *Whitcomb*

*v. Carpenter,* 134 Ia. 227, 10 L. R. A. n. s. 928; *McCutchen v. Roush,* 139 Ia. 351) ; *Myers v. Board of Education,* 51 Kan. 87, 37 Am. St. Rep. 263 (but see *Travelers Ins. Co. v. Caldwell,* 59 Kan. 156; *Kansas State Bank v. First State Bank,* 62 Kan. 788) ; *Carley v. Graves,* 85 Mich. 483, 24 Am. St. Rep. 99 (but see *Board of Fire & Water Commissioners v. Wilkinson,* 119 Mich. 655, 44 L. R. A. 493) ; *State v. Bruce,* 17 Idaho, 1, 134 Am. St. Rep. 245, L. R. A. 1916 C, 1 (see *Bellevue State Bank v. Coffin,* 22 Idaho, 210) ; *Capital Nat. Bank v. Coldwater Nat. Bank,* 49 Neb. 786, 59 Am. St. Rep. 572 (but see *State v. Bank of Commerce,* 54 Neb. 725; *City of Lincoln v. Morrison,* 64 Neb. 822, 57 L. R. A. 885.)"

The note, quoted, correctly indicates that in *State v. Bank of Commerce,* 54 Neb. 725, and in *City of Lincoln v. Morrison,* 64 Neb. 822, this court refused to follow *McLeod v. Evans, supra,* and denied a preference as to trust funds which "might have been" or "were dissipated" in payment of the indebtedness of the trustee. In *City of Lincoln v. Morrison, supra,* this position is reaffirmed, and Pound, C., who delivers the opinion of this court, says, in substance: "We are not able to agree" with the rule stated in *McLeod v. Evans, supra.*

Certainly, these former opinions, last referred to, have been seriously limited, or materially modified, if not wholly overruled, by the latest pronouncement of the present majority.

Conceding that the majority are right in the instant case (which we do not), the profession is entitled to know the full effect of the same as applied to previous decisions. We earnestly protest that the public is entitled to have the law stated from this bench, not only with clearness and certainty as to the disposition of the case now before the court, but also to have its full effect upon prior decisions declared.

Other serious objections to the majority opinion are that it overlooks the fact that the fundamental issue here presented is controlled by the "national bank act," ignores the

policy and interpretation of that act as made by the federal decisions, and fairly denies to the receiver here the right which that statute secures. Then, too, it is in opposition to the trend of legal development which, as evidenced both by statute and decision, is towards greater uniformity.

With reference to the national bank act, the supreme court of the United States said at a very early day: "We consider that act as constituting by itself a complete system for the establishment and government of national banks, prescribing the manner in which they may be formed, the amount of circulating notes they may issue, the security to be furnished for the redemption of those in circulation; their obligations as depositaries of public moneys, and as such to furnish security for the deposits, and designating the consequences of their failure to redeem their notes, their liability to be placed in the hands of a receiver, *and the manner, in such event, in which their affairs shall be wound up,* their circulating notes redeemed, *and other debts paid or their property applied towards such payment.* Everything essential to the formation of the banks, the issue, security, and redemption of their notes, *the winding up of the institutions, and the distribution of their effects, are fully provided for,* as in a separate code by itself, neither limited nor enlarged by other statutory provisions with respect to the settlement of demands against insolvents or their estates." *Cook County Nat. Bank v. United States,* 107 U. S. 445.

The controlling question before the court in *Cook County Nat. Bank v. United States, supra,* was whether the United States was entitled to a preference against the receiver of the bank under section 3466, Rev. St. U. S., then existing, which provided: "Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority hereby established shall extend as

well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed." This claim of preference on part of the government was denied by the court in the following language: "This section (national bank act) provides for the distribution of the entire assets of the bank, giving no preference to any claim except for moneys to reimburse the United States for advances in redeeming the notes. When this reimbursement is fully provided for, the balance of the assets, as the proceeds are received, is subject to a ratable dividend on all claims proved to the satisfaction of the receiver, or adjudicated by a court of competent jurisdiction. Any sum remaining after the payment of all these claims is to be handed over to the stockholders in proportion to their respective shares. These provisions could not be carried out if the United States were entitled to priority in the payment of a demand not arising from advances to redeem the circulating notes. The balance, after reimbursement of the advances, could not be distributed, as directed, by a ratable dividend to all holders of claims; that is, to all creditors."

It may be said in this connection that this decision is in line with the executive practice as evidenced by an opinion rendered by the attorney general of the United States in 1871. 13 Opinions of Attorneys General, 528.

This federal statute was again before the supreme court of the United States in *Davis v. Elmira Savings Bank*, 161 U. S. 275. New York had enacted a law providing: "All the property of any bank or trust company which shall become insolvent shall, after providing for the payment of its circulating notes, * * * be applied * * * in the first place to the payment in full of any sum or sums of money deposited therewith by any savings bank." The receiver of an insolvent national bank, under authority of the comptroller of currency, declined to accede to a demand for pre-

ferred payment under the terms of the state law, predicating his refusal on the ground that the preference was prohibited by the national bank act. The state law was sustained by the state courts, but on appeal to the supreme court of the United States the courts of New York were reversed, the state law held invalid, and the preference denied.

Mr. Justice White, who reviews the previous decisions of the court, in delivering the opinion of the court, says in part: "National banks are instrumentalities of the federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States. It follows that an attempt, by a state, to define their duties or control the conduct of their affairs is absolutely void, wherever such attempted exercise of authority expressly conflicts with the laws of the United States, and either frustrates the purpose of the national legislation, or impairs the efficiency of these agencies of the federal government to discharge the duties, for the performance of which they were created. These principles are axiomatic, and are sanctioned by the repeated adjudications of this court." *Davis v. Elmira Savings Bank, supra.*

All must concede that the term "assets" and the requirement that the comptroller of currency must "make a ratable dividend," etc., must be defined and determined in view of all the provisions of the national bank act; that this act being a federal statute and each of the parties litigant being creatures of the same statute, its provisions are binding upon this court and its construction by the supreme court of the United States must be conformed to by us.

The majority opinion seeks to control the comptroller of currency through the receiver of the Gering bank. It is to be remembered in this connection, as stated by Caldwell, Circuit Judge, in *McDonald v. State of Nebraska*, 101 Fed. 171: "A receiver of a national bank appointed by the comptroller of the currency in pursuance of the act of congress is charged by the laws of the United States with the execu-

tion of certain duties in the performance of which he acts as an agent and officer of the United States. His office is created and his duties defined by an act of congress. In contemplation of law every action brought by or against him in his official capacity arises under the laws of the United States. This action is brought against the receiver in his official capacity for an alleged breach of his official duty to the plaintiff imposed on him by the laws of the United States, and the circuit court had undoubted jurisdiction of the case. *Myers v. Hettinger,* 37 C. C. A. 369, 94 Fed. 370; *Price v. Abbott,* 17 Fed. 506; *Platt v. Beach,* 2 Ben. 303, Fed. Cas. No. 11215; *Stanton v. Wilkeson,* 8 Ben. 357, Fed. Cas. No. 13299; *Kennedy v. Gibson,* 8 Wall. 498; *Bank v. Kennedy,* 17 Wall. 19; *United States v. Hartwell,* 6 Wall. 385; *Armstrong v. Ettlesohn,* 36 Fed. 209; *Stephens v. Bernays,* 41 Fed. 401; *Bock v. Perkins,* 139 U. S. 628; *Hot Springs Independent School Dist. v. First Nat. Bank,* 61 Fed. 417."

Furthermore, the policy of this federal statute, and of its administration, as construed by the comptroller of currency, and as judicially interpreted by the federal courts, necessitates the presumption "that promissory notes, bonds, and other property coming to the hands of the receiver were not procured by the use of, and are not, trust property." *Empire State Surety Co. v. Carroll County,* 194 Fed. 593. Hence, the burden of proof is expressly imposed on claimant to identify property. *Schuyler v. Tittlefield,* 232 U. S. 707.

It must be conceded that the national bank act makes no distinction between claims of creditors by contract and claims of creditors based on tort. The comptroller is required to make a "ratable dividend" on both. Both classes of claims thus share equally. The line of demarcation between the respective rights of owners of "trust funds" and assets subject to the claims of creditors is necessarily involved in determining what of the properties of the insolvent bank are statutory "assets," from the proceeds of which the "ratable division is to be made."

As construed by the federal courts, all property coming

to the receiver is presumed to constitute statutory "assets," save and except property affirmatively shown by claimant to be property owned by him, or its proceeds likewise affirmatively traced to, and identified in, specific property in such receiver's possession. The use of trust funds in the payment of trustees' debts in this connection is universally held an insufficient foundation on which to base a claim of preference. This construction of the federal statute is binding upon this court, and to fail to conform to it is to deny the receiver a right which it secures.

Indeed, we are not without cases directly in point. As we have already stated, the majority opinion herein is substantially identical with *McLeod v. Evans, supra.* The latter case affirms the proposition that— "The conclusion is irresistible, from the facts, that the proceeds of the trust property found its way into Hodges' hands (the trustee) and were used by him either to pay off his debts or to increase his assets. In either case, it would go to the benefit of his estate. * * * We do not understand that it is necessary to trace the trust fund into some specific property in order to enforce the trust. If it can be traced into the estate of the defaulting agent or trustee, this is sufficient."

In *Philadelphia Nat. Bank v. Dowd,* 2 L. R. A. 480, 38 Fed. 172, Seymour, J., reviewed *McLeod v. Evans* (not at that time overruled) and other cases, and announced the following conclusion: "The statute forbidding preferences in the distribution of the assets of insolvent national banks is not believed to prevent a beneficiary from following any trust money, held for him by a bank, into any new investment thereof made by the bank. If, however, the doctrine could be carried to the extent claimed in the Wisconsin or even in the Texas case, it would seem to be an unlawful preference under the act of congress."

This case, last referred to, is not cited as a controlling authority, but merely as an interesting judicial appraisement of the principles underlying the present majority opinion and which form its essential foundation.

Central Nat. Bank v. First Nat. Bank.

"The right of congress to determine to what extent a state court shall be permitted to entertain actions against national banks, and how far these institutions shall be subject to state control, is undeniable." 3 R. C. L. 688, sec. 320.

The supreme importance and unqualified necessity of having the powers of the comptroller of currency, a national federal officer, exercised in all states in accordance with one uniform rule construed in one uniform manner, is beyond dispute or cavil.

As our majority now have it, on the question of right to preference, if the comptroller of currency, by his representative, the national bank receiver, is haled before a Nebraska tribunal, one course of action will be required of him; while, if, in the same city, the action can be before a federal court, the direct opposite will be necessarily enjoined.

All this, as part of an orderly (?) course of judicial administration, is now established for the first time in Nebraska, in face of the admitted trend of juridical development (especially in matters pertaining to commerce and commercial law) toward even greater uniformity, as evidenced both by statutes and decisions. Truly, the mere statement of the conditions created is an unstinted condemnation of the cause.

Remembering our duty to enforce federal statutes, as construed by the supreme court of the nation, and that whatever power this court has in the case before us is derived, not from state laws, but from federal enactments, and conferred, at least, upon an implied condition that the rule of uniformity should ever prevail, for the reasons stated, and, in particular, because it is in effect a denial of a right created and vested by a federal statute, we dissent from the disposition of this case made by the majority, the effect of which is to unlawfully require the comptroller of currency, as a sworn officer of the United States, to exercise his official powers in the instant case in contravention of the terms of the federal statute of his creation.