For the reasons heretofore stated, the judgment is reversed and the cause remanded.

REVERSED.

STATE, EX REL. C. A. SORENSEN, ATTORNEY GENERAL, V. NEBRASKA STATE BANK: CLARENCE G. BLISS, RECEIVER, APPELLANT: VICKERS PETROLEUM COMPANY, INTERVENER, APPELLEE.

FILED JANUARY 7, 1931. No. 27428.

*C. M. Skiles, I. D. Beynon* and *John Wiltse,* for appellant.

*F. A. Hebenstreit, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, THOMPSON, EBERLY and DAY, JJ.

EBERLY, J.

This is an appeal growing out of the failure of the Nebraska State Bank, of Humboldt, Nebraska. It may be said that the controlling facts are not in dispute and may be epitomized as follows: The Vickers Petroleum Company, doing business at Wichita, Kansas, in consideration of merchandise furnished, received on the 12th day of April, 1929, a check of $610.70 drawn by its debtor, the Star Oil Company of Humboldt, Nebraska, on the Nebraska State Bank of Humboldt (herein designated as Humboldt bank), wherein it is conceded the drawer was a depositor and had ample credit to cover the check. In due course this check was by the payee transmitted direct to the Humboldt bank for collection and return. On receipt of this instrument it appears that the latter institution charged it to the account of the Star Oil Company. It is evident that some delay ensued, but on April 24, 1929, there was issued by the Humboldt bank, to cover the amount of the check, a draft drawn by it on its correspondent, the Drovers National Bank of Kansas City, Missouri. When this draft was presented in due course, payment was refused by the drawee, though there was then a credit balance in favor of the drawer of $1,275.57; the Humboldt bank, it appears, having been taken over in the meanwhile by the department of trade and commerce as an insolvent institution. It affirmatively appears in the record, not only that the drawer of the check had at all times a sufficient credit balance to cover the same, but at the time of receipt of this check, as well as on April 24, 1929, the Humboldt bank possessed approximately $10,000 actual cash, which thereafter continuously increased until it attained the sum of $16,000, exclusive of exchange, which it possessed when it was placed in receivership. It may further be noted that in neither pleading nor evidence

is there any reference to the existence of any general, or special, custom or usage in banking claimed to be applicable to the transaction at hand. The claimant prosecuted this proceeding as in the nature of a suit in equity to establish its claim to a trust fund forming a part of the cash in possession of the receiver. The district court determined the issues in favor of the claimant and allowed its claim to the extent of $610.70 as a trust fund in the hands of the receiver of the Humboldt bank and awarded priority as such. The receiver appeals.

Prior to the act of 1925 (Laws 1925, ch. 29) the cause of action would probably never have arisen, and since the enactment of chapter 41, Laws 1929, an adequate remedy for all interests concerned is provided. The act of 1929 was not approved until April 30, 1929, and did not go into effect until July following, and issues presented in this case must be determined without reference to this legislation.

It is to be remembered that, commencing with the establishment of the national banking system, during the civil war, the practice among bankers became current to accept out of town checks as deposits, giving immediate credit therefor, with the attendant privilege of drawing against such credit at once. Such items so received were then usually collected by what is usually referred to as the "circuitous routing" plan through a wide-spread network of correspondent banks, each of which would ordinarily handle such collections, at least of those embraced in the chain, without charge.

This course of business necessarily involved the shunting of collection items back and forth across the country for days, and even weeks, before being finally presented for payment, and for like reason there was also involved a similar delay in the ultimate payment of the draft of the drawee, when such draft was employed by it to transmit the proceeds of such collections. While this course of business was slow, costly, and, fraught with the risk of the additional handling, increased the chance of error, and necessarily increased loss through bank failures, still the

drawee bank, especially in normal times, in the transaction indicated, "earned some profit by using the depositor's money during the period (sometimes weeks) in which the check was traveling the often circuitous route, with many stops, from the payee's bank to its own, and also while the exchange draft was being collected." *American Bank & Trust Co. v. Federal Reserve Bank,* 262 U. S. 643.

Truly circuitous routing, to a certain extent, was necessary to the exercise of proper diligence on the part of the collecting bank. Direct routing of such collections to the drawee bank involved a liability for negligence on part of the sender. For whatever may have been the usual custom between banks as to sending checks direct to the drawee thereof, the general rule that obtained in the absence of special legislation was: "In this country the party who is to pay a check is not a suitable agent for its collection. The sender (to such a party) is guilty of negligence, and custom is no defense." 1 Morse, Banks and Banking (6th ed.) 582, sec. 236a. See *Western Wheeled Scraper Co. v. Sadilek,* 50 Neb. 105.

However, by chapter 29, Laws 1925, passed and approved March 24, 1925, it was expressly provided that as to a check forwarded for payment the collecting bank "may forward such instrument for collection directly to the bank on which it is drawn: * * * Provided, however, such forwarding bank shall have used due diligence in other respects in connection with the collection of such instrument." Thus, in Nebraska, there is a legislative approval of the direct, as distinguished from circuitous, routing of collections as between banks. This statute, however, though remedial, is limited to this clearly expressed purpose.

In their last analysis, the facts in the instant case present the issue as between the owner of the proceeds of a collection item, an ordinary check, and the general creditors and depositors of the insolvent drawee thereof, now represented by the guaranty fund. It must not be forgotten, however, that had the item been presented to the drawee by another local bank, or other agency at Humboldt, the

amount would have been separated from the assets of the failed bank. In the absence of the act of 1925 this would probably have occurred. It therefore should not be regarded as in any sense inequitable to the depositors or to the guaranty fund, subrogated by law to the latter's rights, that when, for reasons of general efficiency, the additional collection steps necessitated by circuitous routing is in legal effect eliminated, and the payment is made and received by the drawee in a dual capacity and for direct remittance which is still retained when insolvency intervenes, the general creditors-and the depositors of the failed bank represented by the guaranty fund are in no worse position if a preferred claim is given the forwarder. In fact, if a preferred claim is to be denied, the result would be to improve the condition of the depositors represented by the guaranty fund, merely because of a statute governing collection practice which they had no part in bringing about, and would wholly ignore the increased risk forced upon nonresident holders of negotiable paper by the direct routing practice authorized by the act in question.

True, a trust fund is the creation of equity and is dependent upon equitable considerations. But do not the latter appear in the instant case?

An analysis of the facts in the present transaction disclose there are but two legal questions presented for determination: First, payment of the check involved; second, transmission of the funds realized from the check.

It is to be remembered that the check as issued was a negotiable instrument which contained, and under the provisions of the Nebraska negotiable instrument law must contain, an unconditional order to pay a sum certain in money. Comp. St. 1929, secs. 62-101, 62-901, and 62-1602. See *Swenson Bros. Co. v. Commercial State Bank,* 98 Neb. 702. In the absence of an agreement between the parties in interest to accept some other medium of payment, payment therefor must be made in money. 8 C. J. 574. And this statute further contemplates that "The instrument must be exhibited to the person from whom payment is

demanded, and when it is paid must be delivered up to the party paying it." Comp. St. 1929, sec. 62-605.

This court is also committed to the doctrine that the Humboldt bank in this transaction must be deemed to have acted in a dual capacity and as having represented the plaintiff as his agent in the transaction. This result is supported by the fact that in this jurisdiction we have definitely adopted the Massachusetts rule as distinguished from the New York rule applicable to the subject before us. *First Nat. Bank of Pawnee City v. Sprague,* 34 Neb. 318; *Henefin v. Live Stock Nat. Bank,* 116 Neb. 331.

Indeed, we have definitely declared: "Where a bank receives an instrument for collection and remittance, it becomes the agent of the sender for such purpose." *Omaha Nat. Bank v. Brady State Bank,* 113 Neb. 711; *Henefin v. Live Stock Nat. Bank,* 116 Neb. 331. It is also true that an agent to collect a debt has not, by virtue of his general employment, authority to release a debtor, except upon payment of the full amount of debt in money. *Smith v. Jones,* 47 Neb. 108; *Cram v. Sickel,* 51 Neb. 828. In view of the express provisions of our negotiable instruments law, it is contemplated that a check sent for collection shall be paid by the use of money and in the manner as therein stipulated. Indeed, the rule thus announced, in substance, has been the rule in transactions between banks and their customers and patrons since time immemorial. Thus, in the early case of *Ward v. Evans,* 2 Ld. Raymond, 928, Holt, Chief Justice, said: "When a servant is sent to receive money on a bill, he cannot accept a note instead of money, without the particular directions of his master. Suppose the servant in this case had brought Wallis' note home to the plaintiff, and the plaintiff had sent him back with it, refusing to accept it, and insisting to have money, then it would not have been a payment beyond all doubt. But indeed if the master does give his consent subsequent to the taking of the note, that will amount to an authority precedent. But then I am of opinion, and always was (notwithstanding the noise and cry, that it is the use of Lambard-Street, as if the contrary opinion would blow up

Lambard-Street) that the acceptance of such a note is not actual payment. I agree the difference taken by my brother Darnall, that taking a note for goods sold is a payment, because it was part of the original contract; but paper is no payment where there is a precedent debt. For when such a note is given in payment, it is always intended to be taken under this condition, to be payment if the money be paid thereon in convenient time."

And in the case arising out of the fact that a collecting bank sent to the drawee bank a draft for collection and remittance, as to the legal effect of a tender by such drawee of its own draft in payment thereof, the supreme court of the United States announced the rule: "A collecting agent is without authority to accept for the debt of his principal anything but 'that which the law declares to be a legal tender, or which is by common consent considered and treated as money, and passes as such at par.'" And further determined that the bank draft tendered in the case then before it did not constitute money in the sense here employed. *Federal Reserve Bank v. Malloy*, 264 U. S. 160. With reference to the contention presented in the case last cited that a custom existed among bankers which sustained it as such, that court further suggests: "But the proof shows that the alleged custom was not known to plaintiffs; and they could not be held to it without such knowledge." And in further discussion of the subject of bankers' customs says: "It is said, however, that there is a custom among banks to settle among themselves by means of drafts so well established and notorious that judicial notice of it may be taken. But the usage here invoked is not that, but is one of special application to a case where the collection of a check is intrusted to the very bank upon which the check is drawn and where payment is accepted in a medium which the contract, read in the light of the law, forbids. The special situation with which we are dealing is controlled by a definite rule of law which it is sought to upset by a custom to the contrary effect." And the supreme court of the United States thereupon denied the contention thus made. This court, on the

subject of bankers' customs and usages, seems to be in harmony with the position last stated. In *Harrison State Bank v. First Nat. Bank,* 116 Neb. 456, Thompson, J., in delivering the opinion of the court said: "One claiming under an exception to a general rule carries the burden of alleging and proving facts which would bring him within such exception." And also: "It is incumbent upon one relying on a special custom as a basis of recovery, not only to allege and prove such custom, but also to prove that the person sought to be bound thereby had knowledge thereof and contracted in reference thereto." See, also, *Shambaugh v. City Bank of Elm Creek,* 118 Neb. 817.

In the instant case the oil company had a credit in the form of a check account with the Humboldt bank in amount sufficient to pay the check which it drew. When this check was presented the drawee bank had cash in its till ample to pay it. It was its duty to pay in cash and in the manner contemplated by section 62-605, Comp. St. 1929. Prior to the enactment of the act of 1925, referred to, due diligence would have ordinarily necessitated the presentment of the check over the counter and would have required the participation in the transaction of two persons, the drawee bank and the representative of the holder of the check. The act of 1925, in effect, merely approved the assumption by the drawee bank of a double capacity. Under its terms it might as drawee bank and at the same time as representative of the holder of the check itself complete the entire transaction. In legal contemplation the provisions of the act of 1925 made no change whatever as to the essentials of the transaction, save and except as to form. After its passage duties theretofore imposed upon two parties might now be performed by one, the drawee bank. The law still contemplated the use of cash in the transaction, which involved the allocation of the necessary amount of the cash in its till by the drawee bank to the discharge of the obligations being paid, accompanied by a full compliance with the essentials of section 62-605, Comp. St. 1929.

Appellant contends that the doctrine announced by this court in the Gering bank case (*Central Nat. Bank v. First*

*Nat. Bank,* 117 Neb. 161; 115 Neb. 444; 115 Neb. 451; 115 Neb. 457; 115 Neb. 472; 115 Neb. 478) precludes the application of the trust fund theory in this case. This court is not of that opinion. Two reasons at least render it inapplicable. First, in these cases there was involved the assets of an insolvent national bank in possession of a federal receiver appointed by the comptroller of currency of the United States under the provisions of the federal statutes. The majority opinion, as finally announced (117 Neb. 161), merely determined that under the facts presented the federal statutes were applicable and conclusive and as to the construction of which the rule announced by the federal decision cited was controlling. The closing sentence of this opinion by Howell, J., limiting the scope of the commitments therein made, is quite significant. Then, too, in the Gering bank case the record therein discloses that the claimant of the preference neither alleged nor proved that at the time of the collection by the Gering bank of the obligations, which formed the foundation of its claim and which were satisfied by checks drawn by such depositors of the Gering bank upon their deposits therein, there was in possession of that bank cash available and sufficient to have paid their checks at the time of the several transactions. In fact, it was at least tacitly conceded in that case that even the small amount of cash which actually reached the possession of the receiver was practically all absorbed in the liquidation of other preferred demands against that institution. It is to be noted that the gist of the decision in the Gering bank case as made by the majority opinion was not that the fiduciary relations did not exist between the claimant, the Central National Bank and the Gering bank, but rather that the former failed in its endeavor to trace the trust funds and identify the same as entering into certain assets of the insolvent institution. It must be conceded that in the instant case the federal rule, in view of the identities of the parties, could not in any manner be invoked, and the conceded possession by the Humboldt bank of approximately $10,000 in cash at the time of the transaction in question which

was not thereafter substantially diminished is amply sufficient to differentiate the Gering bank case from the case now before us.

True, in the instant case there is no evidence that the cash was actually counted out or otherwise physically appropriated to the payment of the oil company's check. The record is silent on this subject. But it affirmatively appears that when that check was presented the drawee's cash was there, and the duties in reference to the same are such as are enjoined by law. Under these circumstances the exactions of equity are not to be denied by mere failure, laches, or even of criminality of the agent in default, when the plaintiff has in no manner been negligent and comes into court with clean hands. "The maxim that equity regards as done that which ought to be done has been said to be equity's favorite maxim. The principle of it is the basis for many forms of equitable relief, and it has been said to be the foundation of all distinctively equitable property rights, estates, and interests. * * * The broad meaning of this maxim is that where an obligation rests upon a person to perform an act equity will treat the person in whose favor the act should be performed as clothed with the same interest and entitled to the same rights as if the act were actually performed." 21 C. J. 200. It follows that upon the conclusion of this transaction when the check was actually paid and canceled the Humboldt bank, in contemplation of equity, had in its possession, as part of its cash, a trust fund equivalent in amount to the face of the check satisfied and paid in the transaction. It also possessed, as its own, only the amount of cash it then had on hand, less the cash which, in contemplation of equity at least, had been allocated to the payment of the check. So long as it retained this trust fund its assets were augmented to that extent, for equity regards the substance and intent and not the form. The record further discloses without question that these funds were actually retained by the bank, maintained intact, and were, together with other assets, taken over by the receiver, appellant herein. The trial court did not err,

therefore, in awarding preference. "Where one bank sends to another, for collection and remittance, notes of third parties, the latter bank holds the same and their proceeds as trustee for the former, which, upon failure of the collecting bank, is entitled to a prior lien therefor upon the assets of the failed bank to the extent that they have been augmented by the trust funds, provided such augmented assets are traced into the possession of the receiver, and into some existing asset of such bank." *State v. Citizens State Bank,* 117 Neb. 359. The principles announced in the *Citizens State Bank* case preclude the necessity for any discussion of the proposition that the agency relation of a collecting bank ends upon collection, and debtor-creditor relation takes its place. In support of the application of the principles of law here made reference may be had to the following cases from other jurisdictions: *Goodyear Tire & Rubber Co. v. Hanover State Bank,* 109 Kan. 772; *Holder v. Western German Bank,* 136 Fed. 90; *Andrew v. People's Savings Bank,* 207 Ia. 948; *Bank of Poplar Bluff v. Millspaugh,* 313 Mo. 412; *Farmers Bank of Bowling Green v. Cantley,* 16 S. W. (Mo. App:) (2d) 642; *Thomas v. Mothersead,* 128 Okla. 157; *Union State Bank v. People's State Bank,* 192 Wis. 28; *Foster v. Rincker,* 4 Wyo. 484.

The receiver insists, however, that the Humboldt bank issued a bank draft or cashier's check which was accepted by the correspondent bank acting as collection agent in behalf of the Petroleum company and forwarded by it for collection, though it was never paid, and that the general rule that the purchaser of a bank draft or cashier's check is not entitled to a trust fund or a preference is applicable. Conceding the statement of the general rule as made to be true, yet neither the petroleum company nor its collecting agencies may be deemed "purchasers" within the meaning of that term as employed in the above rule. The present action is not founded upon the draft that was issued, or indeed upon a draft which was purchased. Here the drawee bank, to transmit a trust fund that it then held, issued a paper which was received by the payee, but when tendered for payment was not paid. Ordinarily,

trust funds may not be transferred or transmitted by use of bad paper. We are indeed on this subject committed to a rule exactly to the contrary to the contention of appellant. "The acceptance by a collecting bank of a check drawn on another bank, in the absence of a specific agreement that such check is to be accepted in payment of an instrument placed in the hands of such bank for collection, is presumed in law to be on condition that the check is good. If the check is dishonored, no payment is effected." *Omaha Nat. Bank v. Brady State Bank,* 113 Neb. 711. No payment being in fact effected in view of the condition which the law attached to the transaction, it was a mere nullity and the creditor may, upon the happening of this breach of condition, pursue his original remedy in equity against the receiver of the Humboldt bank to establish the existence of its trust fund in the assets under the receiver's control.

It follows that the decree of the trial court in awarding to the claimant a preference was proper and is

AFFIRMED.