MERRILL W. WILLAN, APPELLANT, v. WALLACE B. FARRAR ET AL., APPELLEES.

119 N. W. 2d 686

Filed February 15, 1963. No. 35336.

Van Steenberg, Myers & Burke, for appellant.

Reddish, Fiebig & Curtiss, Gantz, Hein & Moran, and Duane L. Mehrens, for appellees.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

SPENCER, J.

This is an action to quiet title to three oil and gas leases. After a trial, the court dismissed the action. When his motion for a new trial was overruled, plaintiff perfected his appeal to this court.

The plaintiff is Merrill W. Willan, who will hereinafter be referred to as Willan. The defendants are Wallace B. Farrar and Helen Farrar, husband and wife, and Hemisphere Oil Company, a corporation. Wallace B. Farrar will be hereinafter referred to as Farrar, and Wallace B. and Helen Farrar will be referred to as Farrars. Hemisphere Oil Company will be referred to as Hemisphere. W. Bonner .Brice, who is president of the Hemisphere Oil Company and the owner of 99 percent of its stock, will be hereinafter referred to as Brice.

Willan, who did business under the trade name of Sandhills Petroleum Company, was the lessee in three oil and gas leases covering more than 22,000 acres, which it is not necessary to describe herein, owned by the Farrars. The leases had a terminal date of June 15, 1961, unless drilling operations were commenced or delay rentals were paid on or before that date. No drilling operations were ever commenced. In April

1961, Brice, for Hemisphere, secured leases from the Farrars on the same property, with the understanding that they would be valid only if the Willan leases were terminated because of failure to pay the delay rentals. It should be noted that Willan acquired his interest in the leases by assignment from Brice and Company, a predecessor of Hemisphere, for $28,569.61, and that Brice at all times was fully informed of the status of the Willan leases. Hemisphere's rights are entirely dependent upon the validity of the Willan leases, and they are active participants in this litigation.

On June 13, 1961, 2 days before the termination of the leases, Willan visited with Farrar in Ogallala, Nebraska, about a 30-day extension for the payment of the delay rentals. Farrar refused to grant a 30-day extension, but did grant one for 10 days. Willan wanted the extension in writing and prepared a sight draft in duplicate, drawn on himself in care of the Bank of Hyannis, Hyannis, Nebraska, which Farrar signed as drawer. The draft provided that it was payment in full, when paid, for the lease rentals. A description of the property leased was attached to the draft. One copy was mailed to the Bank of Hyannis and was received by the bank on June 14, 1961.

On Sunday, June 25, 1961, Willan went to Hyannis, Nebraska, and attempted to locate W. D. Stroud, the executive vice president and cashier of the Bank of Hyannis. Being unable to do so, he went to the Farrar ranch where he made out and delivered to Farrar his personal check drawn upon The Central Bank & Trust Co., Denver, Colorado, for $11,335. The testimony of Willan on this point is as follows: "Q. Will you relate your discussion with Mr. Farrar, please? * * * A. We visited about the weather. There was a storm building up back in the northwest, and a normal friendly visit. I told him I was there to take care of the sight draft; that I stopped and couldn't locate Mr. Stroud, and brought the check on down to him. Q. Handing you

what the court reporter has marked Exhibit 30, please identify it. A. That's the check that I gave him on the 25th of June. Q. Where did you give Mr. Farrar this check? A. There's kind of a retaining wall used both as a bench and desk where we were visiting and I laid it down on the wall there beside Mr. Farrar. Q. Then what happened to the check? A. Well, he mentioned that Mr. Brice was coming in the following day and that maybe I should contact him to explain what happened, and I said that was agreeable with me so he picked up the check and he and I walked in the house. I tried to call Mr. Brice in Denver but we couldn't get through so I went on into Ogallala and called him and talked to him from there. * * * Q. What did you do? Was there any discussion with Mr. Farrar about the check at that time? A. He said he didn't know whether he should take it or not. I said, Wally, you and I are the ones doing business and under the terms of it, it can be paid to the bank at Hyannis or can be paid to you, so I am considering it payment to you. Q. What did you do then? A. Like I said, went into Ogallala and called Mr. Brice and told him, as usual, just under the wire; stopped and delivered the check to Mr. Farrar. He thanked me for saving he and his associates a trip up the following day. Q. Was there any discussion between you and Mr. Farrar about you returning to Hyannis the following day? A. Yes, I told him I would be there if Mr. Brice was coming up. Q. Were you there? A. No, sir. Q. Why weren't you there? A. Mr. Brice indicated he wasn't coming."

Farrar's testimony relative to this transaction is as follows: "Q. Did Mr. Willan contact you again after you signed this draft during the month of June 1961? A. Yes, sir. Q. Where was that contact made? A. At the ranch. Q. By the ranch, you mean your ranch in Grant County? A. Yes, sir. Q. Could you tell us what day that was? A. It was Sunday, June 25th. Q. 1961? A. 1961. Q. Where did you first see Mr. Willan

that day? A. Out in the yard. Q. Had he called you prior to that time by phone or made other contact? A. No, sir. Q. What did he say to you in your yard the afternoon of June 25th, 1961? A. Well, he — when he gave me the check for the lease — Q. I hand you what the reporter has marked Exhibit 30 and ask if you have seen that before? A. Yes. Q. When was the first time you saw that? A. June 25th, 1961. Q. Where was that? A. At the ranch. Q. Is that the check you referred to, he wanted to give you a check to pay the lease? A. Yes, sir. Q. Did he hand that check to you? A. Yes. Q. What did you do with it? A. I laid it on the wall where we were visiting. Q. This was outdoors? A. Outdoors. Q. Did you make any statement to him concerning the check? A. Yes; I told him I didn't want the check; it should be paid at the bank. Q. Did he make any response to that? A. This was a Sunday. Q. Is that all he said about it, it was Sunday? A. I don't remember. I told him I thought he was to pay the bank. I wasn't supposed to take the check. The bank done the business. Q. What did you do then? A. Well, we went into the house. Q. Was there any conversation about why you were going in the house? A. Yes, I told him he ought to talk to Mr. Brice as he wanted to know if Mr. Willan had paid his rental and I said I didn't know. I told him he should call Mr. Brice and talk it out with him. Q. What was done with the check when you went in the house? A. I laid it on the kitchen table. Q. Who took it in the house? A. I did. Q. Did Mr. Willan call Mr. Brice in your presence in your house? A. He tried to get him. * * * Q. What did you then do with the check? A. I brought it into the bank Monday morning."

The next morning, June 26, 1961, Farrar and Brice went to the Bank of Hyannis where they met with W. D. Stroud who had the sight draft drawn June 13, 1961. Stroud looked at Willan's check which Farrar gave to him. He refused to accept it as payment of the sight

draft and handed it back to Farrar. He also wrote "Rtd Unpaid" on the sight draft and gave the sight draft to Farrar.

Sometime on June 26, 1961, Brice drew up affidavits for the signatures of the Farrars, stating that the delay rentals provided for in the Willan leases had not been paid and that no extension had been granted. These were filed for record on June 27, 1961.

On or about the first of July 1961, Willan received the following letter from attorneys representing the Farrars:

"June 27, 1961

"Mr. M. W. Willan
2116 Canyon Lake Drive
Rapid City, South Dakota
"Dear Mr. Willan:          Re:   Wally Farrar

"Wally handed me your check dated June 25, 1961 for $11,335.00. He does not consider this check performance of the 10-day extension he gave you on the delay rental date. The draft you had sent him named Bank of Hyannis as both forwarding and collecting bank. Under the draft, as well as under the lease, the delay rental had to be paid into the bank. This was not done within either the period of the lease or the draft. Mr. Stroud sent notice of the collection item to you in Rapid City, but it was returned marked insufficient address.

"Incidentally, Mr. Stroud called Central Bank and Trust Company Monday morning and was advised there were not sufficient funds in the bank at the time of the call.

"Wally indicated that he was reluctant to do this, but felt that he must because of the volatile nature of the oil activity in the Hyannis area at present.

"Please let us know if you have any questions.

"Yours very truly,
REDDISH & FIEBIG
ATR/lo                By   A. T. REDDISH (Sgd.)
cc: Mr. W. D. Stroud
    Mr. W. B. Farrar"

Willan's check was never presented for payment. Stroud testified that on June 26, 1961, he called the head bookkeeper at the Denver bank and was told the check would not clear, but no attempt was ever made to clear it through the bank on which it was drawn. Defendants also offered in evidence a ledger sheet for Willan in The Central Bank & Trust Co., Denver, Colorado, which indicated that sufficient funds were not on deposit in that bank account to clear the check until July 6, 1961.

The evidence is undisputed that in the early part of June 1961, Willan had made arrangements with the president of the American National Bank of Rapid City, South Dakota, for a credit of eleven thousand five hundred dollars. This was to be transferred from the account of the American National Bank of Rapid City with The Central Bank & Trust Co. of Denver, Colorado, when the Rapid City bank was notified the amount was needed to cover a check issued by Willan. The arrangement had been used before and was confirmed by the officer in the Denver bank who supervised Willan's account in that bank.

In Fritsche v. Turner, 133 Neb. 633, 276 N. W. 403, an early case dealing with a delay rental clause similar to the one involved herein, this court held: "An oil and gas lease, providing that, unless work is commenced by a certain time, or unless the lessee pay a rental stated to renew the lease, it shall terminate, confers an optional right upon the lessee and should be strictly construed in favor of the lessor and against the lessee."

In Valentine Oil Co. v. Powers, 157 Neb. 71, 59 N. W. 2d 150, we held: "Such a delay rental clause is a special limitation, time is of the essence of the contract, and failure of the lessee or his assigns to tender or pay rentals within the specified time automatically terminates the lease without any affirmative action by the lessor, or any one else, for that purpose."

It is the position of the defendants that under these

authorities, the leases involved herein were automatically terminated on June 15, 1961. This would be true unless Farrar's action stayed the operation of the rule.

Paragraph 16 of the leases provides: "All rental payments which may fall due under this lease may be made to Wallace B. Farrar one of the above named lessors, in the manner herein stated."

On June 13, 1961, Willan prepared a sight draft on himself. This arrangement was accepted by Farrar by signing the draft 2 days before the termination date of June 15, 1961. The draft by its terms provided for payment within 12 days of its receipt by the Bank of Hyannis, or June 26, 1961. The check tendered to Farrar in payment was delivered June 25, 1961.

Defendants assert the invalidity of this extension on several grounds. Defendants contend that the statute of frauds is applicable. They argue that oil leases are chattels real; and that until severed, oil or minerals in the ground remain real estate. Fawn Lake Ranch Co. v. Cumbow, 102 Neb. 288, 167 N. W. 75. Their point is, the leases being estates upon special limitations terminating June 15, 1961, extension of the leases even for 10 days would be the granting of another estate upon a special limitation and not a mere extension of time within which to pay delay rentals, and would require an agreement in writing. We do not agree that an extension of 10 days for payment would require a written memorandum. The sight draft herein, however, did recite that it was in payment of the lease rentals and described the property.

A more serious contention is that Helen Farrar, who was a coowner of the real estate, did not sign the sight draft and is not bound by the extension granted by her husband. It is elementary that one cotenant cannot convey his cotenant's interest in real estate. Trowbridge v. Donner, 152 Neb. 206, 40 N. W. 2d 655. Willan's answer is that the leases, by their express terms, provided that payments could be made to Farrar, and

that payment to him would be compliance with the terms of the lease. Farrar accepted the sight draft as payment, and while it granted an extension, it was accepted as payment before June 15, 1961. It may be argued that a sight draft drawn by Farrar on the lessee is not the type of draft contemplated by paragraph 4, which provides: "All payments or tenders may be made by check or draft of lessee or any assignee thereof, mailed or delivered on or before the rental paying date." Helen Farrar did not testify, and there is nothing in the pleadings or the evidence indicating that she in any way disapproved of any of her husband's actions. The view we take on waiver, discussed hereinafter, however, makes the question of a valid extension immaterial.

Willan's position is that on June 25, 1961, Farrar accepted his check which was tendered as payment of the draft. The delay rental was $11,335. The sight draft was for $11,335. Willan's check was for $11,335, and was made payable to W. B. Farrar, who was designated by the leases as one to whom payment could be made. Whether it was in payment of the draft or the delay rental, tender was made and was accepted. When Farrar's attorney wrote Willan under date of June 27, 1961, the reason stated for the refusal to accept the check was that payment of the draft had to be made to the bank, and no other reason is given. The check, however, remained in either Farrar's or his attorney's possession until put in evidence herein. It was never presented for payment, and was never returned to Willan.

We determine that when Willan delivered the check to Farrar on June 25, 1961, Farrar's actions constituted an acceptance by him of the check. He did not refuse it or attempt to turn the check back, but kept it in his possession and took it to his bank with him the next morning. The most favorable construction that can be put on his testimony is that he reluctantly accepted the

check, but the fact remains that his conduct constituted an acceptance.

Defendants suggest the tender of a personal check does not constitute payment. The leases specifically authorized payment by personal check. The sight draft was drawn by Farrar and the check was payable to Farrar. Would anyone argue that the payment of the cash to Farrar would not have discharged the obligation? If we consider the check as payment of the sight draft, no question arises because it was tendered within the time specified for the payment of the sight draft. If, however, we ignore the sight draft, we are then met with defendants' argument that the check was not delivered to Farrar until June 25, 1961, or 10 days after the leases had automatically expired. Our law provides that "unless" leases expire automatically if payment is not made within the time specified. Valentine Oil Co. v. Powers, *supra*.

Willan seeks to avoid the operation of the rule of automatic termination in this case, on the theory that special circumstances require the application of general equitable powers of the court. There are many cases from other jurisdictions which, under a variety of circumstances, have held that equitable relief is applicable to prevent the automatic termination of an "unless" lease. These cases are set out in 3 Summers, Oil and Gas (Perm. Ed.), footnote 92, p. 131. Many of them involve the acceptance of delay rental payments after the date specified for payment. One more nearly in point with the instant case than some of the others is Cordell v. Enis, 162 Ark. 41, 257 S. W. 375, where the lessee mailed lessor a delay rental check 2 weeks after the due date, and the lessor retained the check for a week before returning it. The Arkansas court held that by retaining the check, the lessor had waived his right to insist on the automatic termination of the lease. Inasmuch as this specific point is one of first impression in this state, we believe these cases are more in harmony

with our holding on like situations in other fields.

As we said in State ex rel. Davis v. Farmers State Bank, 112 Neb. 597, 200 N. W. 173, courts of equity should be extremely reluctant to effect forfeitures. This is particularly so when the lessor could avoid any question by simply refusing to accept payment when tendered after the time specified.

We hold that where a personal check has been accepted by a lessor, the lessor is obligated to present the check for payment and cannot declare the lease terminated unless payment is refused.

We hold that where an "unless" lessor accepts delay rentals after the time specified for payment in the lease or retains the payment for an unreasonable time before returning it, he thereby waives strict performance and is estopped to claim termination of the lease.

Defendants further argue that the action should be dismissed because Willan has failed to make timely, proper, and continuous tender of the delay rentals, and because of his failure to make proper continuous tender in his pleadings. We have covered the question of timely and proper tender. When Farrar accepted Willan's personal check, he was obligated to present the check for payment. His failure to do so and his holding of the check constituted a continuous tender. Willan did tender the cash into court after judgment herein, and then he tendered in sufficient to cover the 1961 and 1962 delay rentals. In any event, as we said in Canaday v. Krueger, 156 Neb. 287, 56 N. W. 2d 123: "A formal tender is not necessary where a party has shown by act or word that it would not be accepted, if made, since the law does not require a useless formality."

For the reasons given, the judgment entered herein is reversed and the cause is remanded with directions to the court to set aside the order of dismissal and to enter an order quieting title in Merrill W. Willan in the three oil and gas leases involved herein.

REVERSED AND REMANDED.