MERRILL W. WILLAN, APPELLANT, v. WALLACE B. FARRAR
ET AL., APPELLEES.
124 N. W. 2d 699

Filed November 29, 1963. No. 35336.

(1)

See 174 Neb. 826, 119 N. W. 2d 686, for original opinion.

Van Steenberg, Myers & Burke, for appellant.

Reddish, Fiebig & Curtiss, Gantz, Hein & Moran, Duane L. Mehrens, and Howard R. Williams, for appellees.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

BROWER, J.

Plaintiff and appellant Merrill W. Willan brought this action against Wallace B. Farrar and Helen Farrar, husband and wife, and Hemisphere Oil Company, a corporation, defendants and appellants, to quiet title to certain oil and gas leases covering land in Grant County, Nebraska. The trial court dismissed the action. Plaintiff's motion for a new trial being overruled, he has appealed.

The cause was previously heard herein. Our former opinion in Willan v. Farrar, 174 Neb. 826, 119 N. W. 2d 686, reversed the judgment of the trial court and directed it to enter an order quieting title in the plaintiff. The parties will be designated as they were in the previous opinion. The plaintiff Merrill W. Willan will be referred to as plaintiff or Willan; the defendant Wal-

lace B. Farrar as Farrar, and he and his wife Helen as the Farrars; and Hemisphere Oil Company will be called Hemisphere and its president, W. Bonner Brice, who owns 99 percent of its stock, as Brice.

On June 15, 1960, three oil and gas leases were given by the Farrars to Willan under his trade name of Sandhills Petroleum Company. They covered in all more than 22,000 acres of land in Grant County. These leases were given to replace three previous leases given by the Farrars to Forrest Whetstone and by him and his wife sold and assigned to Willan, reserving an over-riding royalty. The leases of June 15, 1960, were given apparently because of a slight error in the description in the Whetstone leases. Brice and Company, the predecessor of Hemisphere, was the drawee in the drafts drawn by Farrars to pay for the Whetstone leases which were taken up by Willan on receiving the assignment from Whetstone. Brice had full knowledge of the Willan leases. Aside from the description there is no significant difference in the provisions of the three leases of June 15, 1960, involved herein. All three contained a provision for termination on June 15th on each succeeding year, unless drilling operations were commenced or delay rentals were paid on or before that day. No drilling operations ever took place.

In April 1961, Brice secured leases on the same lands for oil and gas from the Farrars for Hemisphere, which are referred to as "Top Leases." They were to be effective if the Willan leases were terminated.

Our previous decision held that Farrar had accepted and retained a personal check of Willan for the delay rentals after June 15, 1961, the day the leases would terminate, unless paid. It further held the acceptance and retention of the check and failure to present it for payment operated as a waiver by Farrars of strict performance and estopped them to claim a termination of the lease.

Our former opinion did not discuss the rights of

Hemisphere except to state they were entirely dependent upon the Willan leases. That aspect of the case will be taken up first herein.

In Fritsche v. Turner, 133 Neb. 633, 276 N. W. 403, an early case dealing with a delay rental clause similar to the one involved herein, this court held: "An oil and gas lease, providing that, unless work is commenced by a certain time, or unless the lessee pay a rental stated to renew the lease, it shall terminate, confers an optional right upon the lessee and should be strictly construed in favor of the lessor and against the lessee."

In Valentine Oil Co. v. Powers, 157 Neb. 71, 59 N. W. 2d 150, we held: "Such a delay rental clause is a special limitation, time is of the essence of the contract, and failure of the lessee or his assigns to tender or pay rentals within the specified time automatically terminates the lease without any affirmative action by the lessor, or any one else, for that purpose."

In the case of Long v. Magnolia Petroleum Co., 166 Neb. 410, 89 N. W. 2d 245, decided subsequently to Fritsche v. Turner, *supra*, and Valentine Oil Co. v. Powers, *supra*, those cases were cited and approved. Its discussion extended these rules further as follows: "As stated in Hannah v. American Live Stock Ins. Co., *supra* (111 Neb. 660, 197 N. W. 404): ' "Forfeitures are looked upon by courts with ill favor, and will be enforced only when the strict letter of the contract requires it; * * *." Haas v. Mutual Life Ins. Co., 84 Neb. 682.' However, it is also true that forfeit and terminate are not synonymous. See, Schneider v. Springmann, 25 F. 2d 255; Kugel v. Young, 132 Colo. 529, 291 P. 2d 695; Woodson Oil Co. v. Pruett (Tex. Civ. App.), 281 S. W. 2d 159; Gillespie v. Bobo, 271 F. 641; Baldwin v. Kubetz, 148 Cal. App. 2d 937, 307 P. 2d 1005. As stated in Kugel v. Young, *supra*: 'While Appellate courts, through the use of inaccurate terminology, have frequently referred to the termination of an unless lease as a "forfeiture," there actually is no element of forfeiture involved. The lessor

is not required to do anything, but the lessee's failure to meet the conditions of the contract automatically terminates it. The interest created in the lessee by such lease does not become forfeited upon failure to comply with its conditions; it simply expires.' When a lease terminates by its own terms the equitable rule as to relieving against forfeitures is not applicable thereto."

Many courts of other jurisdictions have held that the acceptance of delay rentals by a lessor after the date for payment specified in such a lease operates as a waiver of strict performance and estops the lessor to claim a termination of the lease as far as he is concerned. 3 Summers, Oil and Gas (Perm. Ed.), § 452, p. 130.

The question before us now however concerns the rights of Hemisphere under its top leases. We find no decisions of this court in regard to the rights of intervening purchasers.

Courts of last resort in states whose decisions were cited and followed in Long v. Magnolia Petroleum Co., supra, hold that the acceptance of delay rentals by the lessor in an oil and gas lease containing an "unless" provision after the date they were due or an extension of payment thereof by such lessor do not continue the lease in force as against subsequent lessees and purchasers. 3 Summers, Oil and Gas (Perm. Ed.), § 452, pp. 131 to 134.

The case of Rorex v. Karcher, 101 Okl. 195, 224 P. 696, was quite similar to that before us now. The facts and the law applied plainly appear from a syllabus prepared by the court. "A landowner executed an oil and gas lease to defendants on November 1, 1913. On December 11, 1917, and while defendants' lease was still in force, the landowner executed a lease to plaintiff for a period of one and a half years. Defendants' lease would have expired on November 1, 1918, but on September 26, 1918, the defendants procured an extension of the lease for a period of one year. Held, the lease executed by the owner of the fee to the plaintiff was a

valid lease, although executed while there was a valid lease on the property, and the defendants' rights under the extension agreement were subject to the superior rights of the plaintiff under his lease."

The case of First National Bank in Santa Ana v. Coast Consolidated Oil Co., 84 Cal. App. 2d 250, 190 P. 2d 214, cites Rorex v. Karcher, *supra,* with approval and considered it authority for holding an extension agreement under an oil and gas lease, waiving defaults by the lessee, did not affect the rights of a subsequent mortgagee. See, also, to the same effect Lewis-Goodwin Oil & Gas Co. v. Holmes, 171 Ark. 844, 286 S. W. 961; Harrell v. Saline Oil & Gas Co., 153 Ark. 104, 239 S. W. 731.

In the case before us Hemisphere's top leases covered the premises involved before the rental payments provided in the "unless clause" of Willan's leases became due. According to the authorities cited any extension granted by Farrars alone or any waiver caused by their acceptance of the rentals could not affect the rights of Hemisphere. If the rentals were not paid on time the leases expired according to their terms and were at an end. The authorities also appear based on sound reasoning. If Farrars could extend the leases or waive payments of delay rentals for 10 days they could do so for 6 months or any extended period. The top leases were expressly given to be in force on the termination of the prior ones because of nonpayment of the rentals. The Farrars evidently desired that their premises remain under lease if Willan's delay rentals were not paid. Though Willan had an option by which he could continue the leases by paying the rentals when they became due, he was under no obligation to do so. Farrars having given the top leases to Hemisphere owed a duty not to render their provisions ineffective. The purpose of Hemisphere's leases should not be permitted to be defeated by the actions of the lessors at will.

Any estoppel or waiver applicable to Hemisphere would of necessity have to flow from something attribut-

able to it. Hemisphere knew about the agreement discussed later herein between Farrar and Willan to accept payment of the delay rentals on or before June 26, 1961. Hemisphere neither objected nor agreed to the negotiations or the contemplated arrangements. It did nothing to assert its rights under the top leases during the period. Nothing is shown in the record to indicate Hemisphere said or did anything that Willan relied or acted on to his disadvantage. In such a situation Willan's claim of an estoppel against Hemisphere cannot be asserted. The sole question, as far as the rights of Hemisphere as top lessee as against Willan is, did the latter pay his delay rentals on the unless leases on or before June 15, 1961? The evidence is plain he did not and the top leases thereupon fell into place according to their terms.

Though what has been said disposes of the case, as far as Hemisphere is concerned, we shall now discuss it with respect to the rights between Willan and Farrars.

On June 13, 1961, Willan had a conversation with Farrar at Searles Garage in Ogallala, Nebraska. There he asked Farrar for a 30-day extension of payment of the delay rentals. This Farrar refused to grant but did agree to a 10-day extension. Willan thereupon prepared a sight draft in duplicate which reads as follows:

"Bank of Hyannis Hyannis Nebraska June 13 1961 Name of forwarding Bank City State Date Subject to the conditions hereof, PAY TO THE ORDER OF Wallace B. Farrar $11,-335.00 Eleven Thousand Three Hundred Thirty Five - - - Dollars This draft, when paid, is payment in full for lease rentals covering the following described land: Description Attached Forwarding and collecting banks are made agents of all parties hereto and of the grantor (s) of such lease or conveyance, and are directed to observe the conditions and agreements hereof. The payor shall have 12 days after the receipt of this draft by the collecting

bank, whether accompanied by other papers or not, for title examination. Neither forwarding bank nor payee(s) nor the grantor(s) of such lease or conveyance may demand return of this draft or any accompanying papers prior to expiration of the time fixed. Upon payment hereof Escrow Agent shall deliver this draft and any accompanying papers to payor and remit payment to forwarding bank. *In case payment is not made before expiration of the time fixed Escrow Agent shall return this draft and any accompanying papers to forwarding bank and no liability for payment or otherwise shall be attached to any of the parties hereto.*

To:  W. W. Willan
      of Rapid City  S. Dakota
      Care Bank of Hyannis
      Hyannis  Nebraska
      Collecting Bank
              Wallace B. Farrar
              Drawer" (Italics supplied.)

A typewritten description of the real estate leased, previously procured by Willan, was attached to each draft. The draft prepared by Willan had his name thereon as drawee written thereon by him. It was presented to Farrar who signed both copies. Willan mailed one copy to the Bank of Hyannis which received it June 14, 1961. The other he kept.

It is obvious that this draft embodied the agreement for any extension made at that time and could not be varied by parol testimony as to what transpired before. Lefferdink v. Schmutte, 149 Neb. 695, 32 N. W. 2d 194.

Apparently it is argued by counsel for Willan that it could be and was modified by subsequent agreement. In what respect it was modified is not particularized. No subsequent written correspondence is involved. Willan and Farrar met and conversed only once thereafter. Their testimony is summarized hereafter and extended at considerable length in our previous opinion. There is

nothing therein contained that can be construed as an assent by Farrar to any such modification.

An examination of the draft shows certain provisions thereof are clear and unambiguous. It provides that the draft is to be collected by the Bank of Hyannis within 12 days from receipt. It states if payment is not made within that time it is to be returned to the forwarding bank. The Bank of Hyannis was not the forwarder as shown by the evidence. It was not forwarded by a bank. It was apparently ambiguous in this respect. The instrument being an extension of time of oil leases prepared by Willan, it is to be construed in favor of Farrar in that respect as to ambiguities. 2 Summers, Oil and Gas (Perm. Ed.), § 372, p. 485. It is however clear that after the 12 days if no payment was made, no liability for payment or otherwise shall attach to any of the parties thereto.

Willan went to Hyannis on Sunday, June 25, 1961. According to his testimony his purpose was to take up the sight draft for the delay rentals. The bank was closed and he went to the home of the banker, but the banker was not there so he went to Farrar's home. The subsequent conversation, as testified by both Willan and Farrar, is set out in our previous opinion in Willan v. Farrar, *supra*. Willan says he told Farrar he had come to take up the sight draft but couldn't locate the banker and brought the check to him. They were conversing out-of-doors. Willan testified he laid the check drawn on the Central Bank and Trust Company of Denver, Colorado, for the delay rentals in the amount of $11,-335, made to Farrar as payee, on a retaining wall beside Farrar. Farrar told him Brice was coming the next day and asked Willan to call him. Willan testified Farrar said he didn't know whether he should take the check. Farrar says he told Willan he did not want the check, that it should be paid to the bank, and that the bank did the business. Willan testified, "I said, Wally, you and I are the ones doing business and under the

terms of *it, it* can be paid to the bank at Hyannis or can be paid to you, I am considering it payment to you." (Italics ours.) What Willan referred to as "it" is not explained further. Willan does not mention any reply or statement by Farrar thereafter.

At any rate Farrar took the check to the house and laid it on the table. Willan attempted to call Brice but couldn't get him and left without contacting him. He did not again take the check but left it on the table and Farrar did not then attempt to return it to him.

On Monday, June 26, 1961, Farrar took the check to the bank at Hyannis. Brice and W. D. Stroud, the vice president and cashier of the bank, were there. He showed the check to Stroud. Stroud called The Central Bank and Trust Company of Denver on which the check was drawn, and talked with the head bookkeeper. He asked her if the check drawn on Willan for $11,335 was good. She answered that such a check *would not clear*. The sight draft was returned to Farrar after 4 o'clock. The check was retained by him at that time.

"When a bank receives an instrument for collection and remittance, it becomes the agent of the sender for such purpose, and in absence of other controlling facts is without authority to accept for its principal anything but that which the law declares to be legal tender or which is by common consent considered as money and passes as such at par." State ex rel. Sorensen v. Nebraska State Bank, 120 Neb. 539, 234 N. W. 82. Under the circumstances existing at that time the bank was not only justified but required to refuse to accept the same. Especially is this true in view of the specific instructions in the draft that it must be collected within 12 days or returned. The 12 days having elapsed and no collection having been made by the acceptance of Willan's check or otherwise, the draft was given to Farrar and all liabilities of the parties with respect thereto or to the agreement evidenced thereby were, according to its express provisions, ended.

Plaintiff maintains however that in any event the Farrars were bound because of the alleged acceptance of the check under the leases. Farrars quote the provisions of oil and gas leases given them which provide, "All rental payments which may fall due under this lease may be made to Wallace B. Farrar one of the above named lessors, in the manner herein stated."

On June 27, 1961, Farrar's attorney wrote Willan, stating the check had been delivered by Farrar to the attorney. The attorney's letter is set out in full in our previous opinion in Willan v. Farrar, *supra*. Its substance was that Farrar did not consider the check performance of the 10-day extension of the delay rentals; that the draft given to Farrar designated the bank as collecting agent; that under either the lease or draft, it should have been paid to the bank; and that payment was not had within the period of the lease or draft. It explained that Stroud had called the bank at Denver and was advised there were not sufficient funds in the bank at that time.

A photographic copy of Willan's bank statement at The Central Bank and Trust Co., of Denver, Colorado, is in evidence. It shows Willan did not have an amount in his account sufficient to pay the check given to Farrar from June 15, 1961, until July 6, 1961.

An arrangement for credit to Willan however was shown by the separate depositions of Walter W. Pailing, president of the American National Bank of Rapid City, South Dakota, and Marvin Owens, a vice president of The Central Bank and Trust Company at Denver.

Owens stated he had a conversation with Willan in the latter part of May 1961, in which Willan had advised him that he was issuing a check "in the 10 to 12 thousand dollar range"; *that if the check came to let Willan know in time to obtain funds through the American National Bank of Rapid City, South Dakota;* and that on previous occasions Pailing had called him from Rapid City and asked him to cash checks for Willan from funds

of the American National Bank on deposit in The Central Bank and Trust Company. Owens said if Pailing telephoned and advised him to deposit $11,500 in Willan's account he would have done so. The check was never presented and Pailing never called. Owens said he agreed to notify Willan if such a check appeared, "If at all possible for me to, I agreed to do it. However, I did not take the complete responsibility of guaranteeing that I would, but I told him I would if I could." Owens made no written memorandum of the conversation with Willan available to other officers or agents of the bank. On recross-examination he was asked if he had been ill or out of the bank for any reason, the fact that such a check had been presented would not have been called to anyone's attention. He answered, that he couldn't make an absolute statement as to such a case; and that it could have been returned for the reason of insufficient funds.

Pailing, president of the American National Bank of Rapid City, South Dakota, testified that prior to June 12, 1961, he thought early in that month, Willan had asked that a credit of $11,500 be advanced to him; that he had authority to extend such credit; and that he agreed to do so. Willan's proposed use of the credit either was not disclosed or not remembered by him. He said the bank at Rapid City had at all times a deposit at The Central Bank and Trust Company at Denver with whom they corresponded. Such balance was seldom less than $50,000. The method to be employed if Willan desired the Rapid City bank to take up his check at the Denver bank would be for Pailing to telephone the Denver bank and have it pay the check and contact Willan and ask him to sign a note or deposit the funds thereafter if there were not sufficient funds in Willan's account; that in June 1961, Willan did not have a sufficient amount in his account with the Rapid City bank to pay the check, but that the credit had been extended to him.

The plaintiff still contends however that it was the duty of Farrar to present Willan's check to the Denver bank or return it at once, and that the keeping of the check constituted its acceptance as payment of the delay rentals at least as far as Farrars were concerned. It is apparent however that presentment could not have been made within the 10-day extension granted by Farrar.

The delivery to, or acceptance by, the creditor of the debtor's check, as distinguished from the actual payment of the check, is not absolute payment of the obligation for which the check is given in the absence of any agreement or consent to receive it as payment. 70 C. J. S., Payment, § 24, p. 233. This rule applies to the acceptance of all commercial paper as shown by the annotation in 85 A. L. R. 1057. Hockert v. New York Life Ins. Co., 224 Iowa 789, 276 N. W. 422; Young v. Hibbs, 5 Neb. 433; Chamberlain Banking House v. Woolsey, 60 Neb. 516, 83 N. W. 729; Gilland v. Honeywell, 103 Neb. 50, 170 N. W. 357.

"A creditor who has accepted paper, such as a check, bill, or note, in conditional payment of a debt may ordinarily, if such paper has not been paid, rescind the conditional payment and sue on the original indebtedness." 70 C. J. S., Payment, § 42, p. 247.

"A creditor rescinding a conditional payment ordinarily may not recover on the original debt if he fails to account for the paper received, and the necessity for so accounting is not removed by a release from liability on such paper." 70 C. J. S., Payment, § 43, p. 247. The annotation at 85 A. L. R. 1057 cites many cases applying this rule.

Practically all the cases cited in the texts referred to are in regard to rescinding conditional payment by the acceptance of commercial paper involving checks that were not paid on presentation either by failure of the bank or the insufficiency of funds to pay the checks on presentation and an attempt is made to collect on the original obligations. Here Farrar is not attempting

to collect any past indebtedness but seeks to assert his rights on the premises covered by the "unless" oil and gas leases because of nonpayment of the delay rentals. The principle remains the same.

No question arises as to the nonproduction of the check asserted by Willan to have been accepted in payment. The check was presented at the trial and introduced in evidence.

It is obvious the check could not operate to pay the delay rentals in any event. There were no funds of the drawer in the bank upon which it was drawn or the bank from which the credit was extended with which to pay it. There was no agreement worthy of reliance at the drawee bank or with its officers that it would be paid. Farrar had been informed that if it was presented it would not clear. The bank officer who had extended the credit had not conferred with the officer who was to pay the check. It is not shown that Willan had instructed them to confer in this instance. Neither officer knew the check was issued. No steps had been taken to inform others in either bank of the arrangement. According to Willan's instructions if the check was presented at the Denver bank, Owens, if he could, would have notified Willan if he could have been contacted. Willan presumably would have told him to phone Pailing. Why this circuitous line of credit was set up by Willan is not explained. In fact he does not allude to the arrangement in his testimony. He came from Rapid City the day the check was given to Farrar with the purpose in mind of taking up the sight draft. Why he did not use a check on the bank at Rapid City with which he had been and was a customer and complete the credit arrangement himself in Rapid City before going is not shown.

Indeed even in those states whose courts have applied the rules of forfeiture to the rights of lessees in an "unless" lease, Willan's action concerning the alleged payment by check would have defeated his contentions by

reason of his own negligence in not providing assurance of its being honored.

The situation is somewhat similar to that in Gillespie v. Bobo, 271 F. 641, where the lessee in an unless case by mistake sent a check to the wrong address for rentals to a lessor within time. The check was sent to the lessor by name at an address, Box 43, Fort Worth, Texas. Her true address was Box 43A, Fort Worth, Texas, which was entered correctly on the books of the lessee. The "A" omitted from the address designated rural mailbox and the check was not received. The trial court held forfeiture applied because of the negligence of the lessee. The Circuit Court of Appeals held that there might have been sufficient evidence to sustain the trial court's ruling but forfeiture did not apply and that the lease had simply terminated. The opinion stated: "There was no forfeiture within the meaning of the equitable rule or doctrine on that subject. A result of a forfeiture is a loss or divestiture of something previously acquired or vested conditionally. 10 R. C. L. 329. The consequence of a failure to do what is required to acquire a right or thing is not a forfeiture of it. A forfeiture by a debtor is frequently prescribed or provided for as a means of securing the payment of the debt, the subject of the forfeiture being of greater value than the amount of the debt. In such case, equity, recognizing that the main purpose is to afford security to the creditor, relieves the debtor from the forfeiture upon his paying the debt, with interest; the payment of interest being full compensation for the debtor's failure to pay the debt when it was due. 1 Pomeroy's Eq. Jur. (4th Ed.) § 381. It was not part of the purpose of the above set out provision of the lease to secure the payment of any sum due to the appellees or either of them. The appellant was under no obligation to pay the $80. There was no debt to be secured. The quoted provision stated the condition to be complied with by the lessee to obtain an extension of the time allowed for beginning drilling

operations. Compliance with that condition would have been the exercise of an option given to the lessee. * * * The evidence did not show that the appellant did what was required to constitute an exercise of this option within the time allowed by its terms. The court properly ruled against the claim he asserted." Texas decisions are quoted, and the principles therein announced are adopted with respect to unless leases in Long v. Magnolia Petroleum Co., *supra,* by this court in which it held that when an unless oil and gas lease terminates by its own terms the equitable rules as to relieving against forfeitures do not apply.

There are of course certain instances where a lessor in an "unless" lease by his actions in retaining an uncashed check received after due date may be estopped to assert that the lease has terminated. In such cases the essential element of estoppel is a representation relied upon by the party claiming the benefit of the estoppel, which induced him to act or refrain from acting to his prejudice. Woodside v. Lee (N. D.), 81 N. W. 2d 745. Generally in cases involving unless oil leases such estoppel arises where the lessee commences drilling operations or otherwise incurs great expense relying on the retention of the uncashed check by the lessor. Such a situation does not exist here.

Certain cases are cited by counsel for Willan in urging the contention that the check in this instance should have been presented by Farrar for payment. Included within these is Millett v. Miller, 135 Neb. 123, 280 N. W. 442. It was a case where a debtor gave a check to his creditor to pay his obligation. The check was drawn against funds in the bank. The creditor and payee neglected for 6 days to present the check. The bank closed toward the end of the 6-day period. It was held the delay was unreasonable and the check should have been presented. Under the circumstances the debt for which the check was given was discharged. The case and other similar ones cited have no application here.

There was no debt owed by Willan to Farrar. Farrar was lessor in both the unless leases of Willan and the top leases of Hemisphere. He had given a 10-day extension on the leases to Willan at that time evidencing a desire not to give more. On the day the check was left on the table he had expressed doubt as to whether he should take it and asked that the holder of the top leases be contacted. The sight draft was to be paid the next day at which time the 10-day extension was ended. He took the check to the bank where he received information which gave him good reason to believe it would not be honored if presented.

He caused notice to be given that he would not accept the check as payment of the rentals within 2 days of its receipt and within 1 day of the conclusion of the period of the extension in the sight draft which was to have been paid. The notice was given with reasonable promptness.

From what has been said it follows that our previous opinion should be vacated, and the judgment of the trial court affirmed. The money paid into court by the plaintiff as a tender of the delayed payments should be restored to him.

FORMER OPINION VACATED.

AFFIRMED.

SPENCER, J., dissenting.

I dissent from the majority opinion for the reasons stated in the previous opinion in 174 Neb. 826, 119 N. W. 2d 686. I believe the result reached therein is more in harmony with equitable principles as well as with the majority of other jurisdictions which have passed on analogous situations.